No. 102,287

In the Matter of the Adoption of BABY GIRL P.
(242 P.3d 1168)

Review of the judgment of the Court of Appeals in an unpublished opinion filed January 22, 2010. Opinion filed October 29, 2010.

*Zach Chaffee-McClure*, of Shook, Hardy & Bacon, L.L.P., of Kansas City, Missouri, argued the cause, and *Debra A. Vermillion*, of Vermillion Law Office, L.L.C., of Kansas City, Kansas, was with him on the briefs for appellant natural father.

*Kevin W. Kenney*, of Kevin W. Kenney, P.A., of Prairie Village, argued the cause and was on the briefs for appellees adoptive parents.

*Martin W. Bauer*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, was on the brief for *amicus curiae* American Academy of Adoption Attorneys.

The opinion of the court was delivered by

ROSEN, J.: In this case, the courts are again called upon to make the painful determination of whether a child should reside with a natural parent, who has the emotional bonds that follow from biological fatherhood, or with prospective adoptive parents, whose emotional bonds have evolved over many months of loving, supporting, and caring for the child. It is ultimately a legal decision which this court must reach, but it is a legal decision that is shadowed by the heartbreak of severing human bonds. A review of judicial decisions from various jurisdictions demonstrates how courts struggle with these painful choices. See, *e.g., Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 65, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989); *Roe Family Services v. Doe*, 139 Idaho 930, 88 P.3d 749 (2004); *Hale v. Cramer*, 254 Md. 592, 255 A.2d 37 (1969); *McCann v. Doe*, 377 S.C. 373, 660 S.E.2d 500 (2008); *In re Mata*, 212 S.W.3d 597 (Tex. App. 2006); *In re Reinius*, 55 Wash. 2d 117, 346 P.2d 672 (1959).

Baby Girl P. was born on June 23, 2008, in Overland Park, Kansas. Her mother was Lauren P., who was married at the time to Cortlandt James P. (C.J.). They were living in Florida when they separated in May 2007; Lauren then moved to Kansas, where she lived with her parents.

In fall 2007, while living in Kansas, Lauren began a romantic relationship with Devon M. Devon was employed at the time in a part-time job with a lawn service and was living with his mother. His income was around $200 per month, some of which he paid

to his mother to contribute to his living expenses and some of which he used to pay his telecommunications bill. In June 2008, he obtained regular employment with an annual salary of about $25,000 and with benefits that included health insurance.

In October 2007, Lauren learned that she was pregnant, and some time after November 20, 2007, she informed Devon. Lauren and Devon both considered Devon the father, and subsequent DNA testing did not exclude him as the father.

According to Lauren's trial testimony, Devon was indifferent to the news, expressing no interest in the pregnancy or subsequent parenthood. In an earlier deposition, however, Lauren testified that Devon was excited when he learned about the pregnancy. There was also testimony that after learning Lauren was pregnant, Devon bought her flowers and told her he wanted the relationship to become more committed and durable because they were going to be a family raising a child together. He also kept the pictures of the sonograms that Lauren sent him in November.

Lauren ended the relationship with Devon in mid-December 2007, shortly before her husband made preparations to come to Kansas. Lauren testified that from that time on, she did not hear from Devon. Her telephone records, however, revealed that Devon made numerous telephone calls and sent numerous text messages for many weeks after she alleged that she had no contact with him.

There was testimony that Lauren told Devon in a text message in February or March 2008, that she had suffered a miscarriage, although at trial Lauren denied having sent such a message. Lauren had told him about two previous miscarriages, so Devon assumed he had no reason to question the veracity of her message. An acquaintance of Lauren told Devon that she thought Lauren was no longer pregnant because she did not look pregnant and because she continued to drink and smoke as if she were not pregnant. There was also testimony that Lauren informed Devon that she was moving to Texas and that he was not to contact her anymore.

During the 6 months prior to Baby Girl P.'s birth, Devon did not provide or offer to provide Lauren with any money, Christmas presents, clothes, or other material support. He explained that he

did not provide her with support because he believed she had suffered a miscarriage.

In January 2008, Lauren and C.J. reconciled, and in March 2008 they moved into an apartment in Johnson County. During the reconciliation process, Lauren did not inform C.J. that she was pregnant. When C.J. finally learned of the pregnancy, in April or May 2008, he said he did not want to raise the child and wanted it placed for adoption.

On the day Baby Girl P. was born, Lauren told one of the doctors at the hospital that she intended to place the child for adoption. The following day, Lauren signed an affidavit in which she provided an incorrect surname name for Devon. She later testified that she "didn't really remember his last name." She also averred in the affidavit that Devon had moved to an unknown address and city in Florida, which she knew was false. She testified that she gave this incorrect information because Devon had talked about moving to Florida to be with his father. She did not provide Devon's last known street address to investigators, claiming not to remember what it was. Although she had been arrested in front of Devon's house for driving under the influence of alcohol, she did not inform the adoption investigators where his house was or that they would be able to find it from the arrest record. As a consequence, Devon was not informed of the birth and was initially unaware that he had a daughter.

On July 10, 2008, a petition for adoption was filed in district court. In August 2008, an investigator contacted Devon's mother pursuant to the adoption proceeding. As a result, Devon and his mother learned that Lauren had carried her pregnancy to term and he immediately obtained counsel in an attempt to protect his parental rights. He then filed motions through counsel seeking visitation with his daughter. He eventually was permitted to visit the child on two occasions for 1 hour each time. Devon wrote to the prospective adopting couple thanking them for allowing him to visit his daughter and offering to provide support for her. He and his mother also delivered Christmas presents to the adoption agency to pass along to the child.

Lauren voluntarily relinquished her parental rights, and the custodial couple filed a petition for adoption. The district court bifurcated the parental rights issue from the adoption issue and conducted an evidentiary hearing on December 17-18, 2008. In a memorandum decision filed March 3, 2009, the district court granted the petition to terminate Devon's parental rights. The adoption issue remains pending in the district court.

The district court made a number of specific factual findings, many of them expressed as negatives: Devon did not fail to provide Lauren with support without good cause during the 6 months preceding Baby Girl P.'s birth; he did not abandon Lauren after having knowledge of her pregnancy; he did not abandon or neglect Baby Girl P. after he learned of her birth; and he made reasonable efforts to communicate with Baby Girl P. after her birth. He neglected his legal obligation to support Baby Girl P. after he learned of her birth, however, by not providing or offering financial support for the child and by not establishing his parental rights in a separate custody proceeding.

The district court then considered Baby Girl P.'s best interest under K.S.A. 2009 Supp. 59-2136(h)(2)(A). The court noted that Devon had failed to demonstrate a commitment to support her. He failed to investigate zealously whether Lauren had told the truth about the miscarriage, which foreclosed him from pursuing a paternity proceeding, claiming custody, and committing his financial support for her upbringing. These factors "undergird[ed]" the additional finding of the child's best interest, which "tip[ped] the evidentiary scale" in favor of termination.

Following the denial of his motion to reconsider, Devon appealed to the Court of Appeals. The district court stayed resolution of the adoption proceedings pending final resolution of the appeal. In *In re Adoption of Baby Girl P.*, No. 102,287, unpublished opinion filed January 22, 2010, the Court of Appeals affirmed the district court but expressed concerns about the burden Kansas case law places on fathers when they attempt to assert parental rights. This court granted review on all issues.

### Discussion

As a preliminary matter, we must address the jurisdiction of the

appellate courts over this appeal. K.S.A. 2009 Supp. 59-2401a(b)(1) permits appeals from "any final order[,] judgment or decree" entered in "any proceeding pursuant" to the Kansas Adoption and Relinquishment Act. The adoption proceeding is still pending in the district court, and the district court did not certify this case for interlocutory appeal under K.S.A. 2009 Supp. 60-2102(c).

An appeal may be taken as a matter of right from any final decision in a civil proceeding. A final decision generally disposes of the entire merits of the case and leaves open no further questions or the possibility of future directions or actions by the district court. *Flores Rentals v. Flores*, 283 Kan. 476, 481-82, 153 P.3d 523 (2007). Interlocutory and piecemeal appeals are discouraged and are considered exceptional. When a district court bifurcates an action and delays ruling on some part of the matter before it, the case usually becomes ripe for appeal only when the district court enters final judgment on all pending issues. *Cf. McCain v. McCain*, 219 Kan. 780, 783, 549 P.2d 896 (1976).

An appellate court has a duty to question jurisdiction on its own initiative. When the record discloses a lack of jurisdiction, it is the duty of the appellate court to dismiss the appeal. *State v. Gill*, 287 Kan. 289, 294, 196 P.3d 369 (2008). We therefore must determine whether the termination order was a final order, which would confer jurisdiction to the appellate courts.

We conclude that an order terminating parental rights is an appealable final order under K.S.A. 2009 Supp. 59-2401a(b)(1). That statute allows appeals from final orders, judgments, and decrees. That language is broader and more inclusive than the language found in K.S.A. 2009 Supp. 60-2102(a)(4), the statute governing general civil appeals, which speaks only to final "decisions." K.S.A. 2009 Supp. 38-2273(a), which governs appeals under the Revised Kansas Code for Care of Children, explicitly identifies termination of parental rights as an "order" subject to immediate appeal. Requiring that a party in an adoption proceeding wait to appeal a termination of parental rights until the adoption is concluded would have no judicial benefit and could unnecessarily prolong final resolution of custody issues. Allowing an immediate appeal from an order terminating parental rights pursuant to an adoption

proceeding is consistent with the statutory scheme and the interests of justice. The appellate courts accordingly have jurisdiction over this appeal.

We now turn to the substantive issues, in particular, whether Devon forfeited his parental rights because he neglected his daughter.

Natural parents who have assumed their parental responsibilities have a fundamental right, protected by the United States Constitution and the Kansas Constitution, to raise their children. K.S.A. 2009 Supp. 59-2136(d) expresses Kansas' public policy that the best interests of children are served by fostering their relationships with their natural parents in cases where the parents have assumed parental duties toward their children. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1057-58, 190 P.3d 245 (2008).

We strictly construe adoption statutes in favor of maintaining the rights of natural parents in those cases where it is claimed that, by reason of a parent's failure to fulfill parental obligations as prescribed by statute, consent to the adoption is not required. *Adoption of G.L.V.*, 286 Kan. 1034, Syl. ¶ 6. A natural parent's right to raise his or her child is tempered by the extent to which the parent has assumed his or her parental responsibilities. When a natural father has assumed a sufficient level of parental responsibility under Kansas law, his parental rights are entitled to constitutional protection. *Adoption of G.L.V.*, 286 Kan. at 1061-62.

A petitioner in an adoption proceeding under K.S.A. 2009 Supp. 59-2136 has the burden of proving by clear and convincing evidence that termination of parental rights is appropriate. *In re Adoption of B.B.M.*, 290 Kan. 236, 243, 224 P.3d 1168 (2010). A court is to consider all of the relevant surrounding circumstances in an action based on K.S.A. 2009 Supp. 59-2136(h)(1)(D). Poverty alone is an insufficient basis for termination under that provision. *Adoption of B.B.M.*, 290 Kan. at 245.

Appellate courts will uphold termination of parental rights if, after reviewing all the evidence in the light most favorable to the prevailing party, they deem the district court's findings of fact to be highly probable, *i.e.*, supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on

the credibility of witnesses, or redetermine factual questions. *Adoption of B.B.M.*, 290 Kan. at 244.

A determination of whether to terminate paternal rights incident to an adoption is subject to K.S.A. 2009 Supp. 59-2136. K.S.A. 2009 Supp. 59-2136(h)(1) allows a district court to terminate parental rights upon finding by clear and convincing evidence any of the following factors:

"(A) The father abandoned or neglected the child after having knowledge of the child's birth;

"(B) the father is unfit as a parent or incapable of giving consent;

"(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

"(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

"(E) the father abandoned the mother after having knowledge of the pregnancy;

"(F) the birth of the child was the result of rape of the mother; or

"(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition."

K.S.A. 2009 Supp. 59-2136(h)(2) further provides that, when making such a determination, the district court may consider and weigh the best interest of the child and may disregard incidental visitations, contacts, communications, or contributions.

Devon initially asks this court to extend to nonstepparent adoption proceedings the so-called "ledger test" for support that has been applied in stepparent adoption proceedings under K.S.A. 2009 Supp. 59-2136(d). Under the ledger test, failure to provide financial support is just one aspect of neglect; failing to provide emotional support is the other aspect. Balancing these two aspects is a requirement in determining whether a parent has neglected a child in the context of stepparent adoptions. See *Adoption of G.L.V.*, 286 Kan. at 1054; *In re Adoption of B.M.W.*, 268 Kan. 871, 882, 2 P.3d 159 (2000); *In re Adoption of K.J.B.*, 265 Kan. 90, 99-101, 959 P.2d 853 (1998); *In re Adoption of C.R.D.*, 21 Kan. App. 2d 94, 100-02, 897 P.2d 181 (1995) (Lewis, J., concurring). Devon contends that the district court's factual findings in his case satisfied the ledger test because he attempted to provide emotional support in addition to his offers of financial support.

Our legislature chose different statutory language for the factors that a district court is to consider when addressing stepparent and nonstepparent adoption proceedings. K.S.A. 2009 Supp. 59-2136(h) is more specific in terms of setting out factors for termination than K.S.A. 2009 Supp. 59-2136(d). Unlike K.S.A. 2009 Supp. 59-2136(d), which speaks generally to failure "to assume the duties of a parent," K.S.A. 2009 Supp. 59-2136(h)(1)(C) allows for termination if the father fails to make reasonable efforts "to support *or* communicate with the child." (Emphasis added.) The disjunctive "or" used in this part of the statute demonstrates a legislative intent that failure to provide either component—financial or emotional support—may suffice in itself to warrant terminating parental rights. We therefore decline to extend the ledger test to nonstepparent adoption proceedings.

Devon next argues that, notwithstanding the ledger test, substantial competent evidence did not support the district court's conclusion that he had failed to make reasonable efforts to support his daughter. A discussion of this issue necessarily includes addressing whether Devon made reasonable efforts to investigate the course of Lauren's pregnancy.

The Court of Appeals determined that K.S.A. 2009 Supp. 59-2136(h)(1)(A) and (C) are not redundant, and evidence of financial neglect under subsection (C) is not the same as abandoning or neglecting a child under subsection (A). We agree. We presume that the legislature does not enact subsections that render other subsections redundant. See *State v. Dickson*, 275 Kan. 683, 691, 69 P.3d 549 (2003). Financial neglect may not serve as the only basis for a finding of neglect under subsection (A); the court must have some additional evidentiary basis for finding neglect under that subsection.

The Court of Appeals concluded, however, that the evidence supported the district court's finding of neglect under subsection (C). The district court noted that Devon had failed to request a paternity proceeding to claim custody of his daughter and had failed to commit his financial support to her. The district court further criticized Devon's failure to discover that Lauren had deceived him about the reported miscarriage, suggesting that a father

should disregard the mother's warnings that he is to leave her alone and instead go to her school or place of work or inquire of her friends to determine whether she is pregnant. The Court of Appeals agreed, finding that a father may not rely on the mother's misstatements about a miscarriage or abortion and that the father must "use all means at his disposal to investigate" a mother's claim of miscarriage and must "use all means at his disposal to provide support for the child" once he learns of the birth. *In re Adoption of Baby Girl P.*, 2010 WL 348291, at *3, (Kan. App. 2010) (unpublished opinion).

We disagree. We do not find in the statutory scheme a legislative call to make the assertion of paternal rights a Herculean task. The preservation of a father's relationship with his child is the starting point of a termination proceeding, not the finish line that a father must labor to reach. The statute requires simply that a father make "reasonable efforts" to support or communicate with his child. K.S.A. 59-2136(h)(1)(C).

We have previously held that adoption statutes must be strictly construed in favor of maintaining the rights of natural parents when it is claimed that a parent has failed to fulfill parental obligations. *Adoption of G.L.V.*, 286 Kan. 1034, Syl. ¶ 6. Setting up a series of hurdles that a parent must clear before reaching the point of a protected interest runs counter to our case law and to the statutory framework.

The record and the district court's factual findings support the conclusion that Devon made reasonable efforts to engage with and support his daughter.

Devon had several reasons to believe that Lauren had miscarried. She explicitly told him that was the case; she earlier told him that she had experienced miscarriages in the past; and an acquaintance of hers informed Devon that she was engaging in behavior that one might not expect of a pregnant woman and that she believed Lauren was no longer pregnant. We cannot read into the statute a requirement that a father invade a mother's privacy to determine whether she is pregnant when the father has sound reasons to believe that she is not.

Upon learning that he had a child, Devon sought visitation with his daughter, explicitly offered the custodial parents anything that they might need, and told them that he understood it was his responsibility and duty to provide for her and he was prepared to assume that responsibility. He also provided her with gifts for her first Christmas. These are the actions of a father who is attempting to maintain a relationship with his child, not the actions of a father who is neglecting his child.

The Court of Appeals suggested that an all-encompassing offer of support was not reasonable and that a father must undertake additional actions, such as setting up a special bank account for the child whom he is not allowed to support directly, to prove his willingness to provide support. We again disagree. We find nothing in the adoption statute requiring that a parent must make extraordinary displays of financial support in order to avoid a finding of neglect.

Although the statute allows the district court to disregard "incidental" parental activities, Devon's efforts were clearly more than incidental. He retained counsel, he filed court actions to obtain visitation, he gave gifts, and he offered to give anything that was needed for his daughter's support. As used in our adoption statutes, incidental means "casual, of minor importance, insignificant, and of little consequence." *In re Adoption of McMullen*, 236 Kan. 348, Syl. ¶ 1, 691 P.2d 17 (1984). Devon's conduct upon learning that he had a daughter was scarcely casual or insignificant. It demonstrated a commitment to assuming the role of a father.

Both the district court and the Court of Appeals improperly relied on *In re Adoption of A.A.T.*, 287 Kan. 590, 196 P.3d 1180 (2008), *cert. denied* 129 S. Ct. 2013 (2009).

In *A.A.T.*, this court emphasized the significance of the natural father not appearing at the termination hearing. The court noted that under K.S.A. 2009 Supp. 59-2136(g), in the event the father does not appear or appears but does not assert custodial rights, the factors listed in K.S.A. 2009 Supp. 59-2136(h) do not come into play. *Adoption of A.A.T.*, 287 Kan. at 624-25. Such was the case in *A.A.T.* In addition, the adoption had been finalized in *A.A.T.*, 6 months before a parental interest was asserted, which abrogated

operation of the parental preference doctrine that would otherwise have favored the biological father. *Adoption of A.A.T.*, 287 Kan. at 626. By contrast, Devon made his appearance and strongly asserted his rights at the termination hearing in the present case. K.S.A. 2009 Supp. 59-2136(h) was therefore the proper statute to consider, and the adoption proceeding is still pending. "When applying K.S.A. 59-2136(h), Kansas appellate courts have strongly endorsed the parental preference doctrine, required strict compliance, and diligently enforced the clear and convincing evidence standard." *Adoption of A.A.T.*, 287 Kan. at 625.

*A.A.T.* presented a set of facts that made it the exceptional case. It does not set out a series of heroic quests that a father who appears in a pending adoption case must undertake so that he may triumphantly return bearing the prize of a relationship with his child. Instead, the law presumes that the father starts out with a parental relationship; it is his to abandon, not to conquer.

In addition to finding neglect on Devon's part, the district court also found it to be in Baby Girl P.'s best interest to terminate Devon's parental rights. The exact basis for this finding is unclear from the court's order; the court apparently looked to Devon's unwillingness to pursue Lauren aggressively to determine whether she was still pregnant. The Court of Appeals speculated that the district court also based this conclusion on a home-study report and in-court observations of the custodial parents.

In *G.L.V.*, we held that the best interest of the child factor that was added through the 2006 amendment to the stepparent adoption portion of K.S.A. 2009 Supp. 59-2136(d) does not trump the requirement that a natural parent who has assumed his or her parental responsibilities must consent before a stepparent adoption can be granted. *Adoption of G.L.V.*, 286 Kan. at 1063. K.S.A. 2009 Supp. 59-2136(h) likewise sets out sequential factors that may serve as grounds for termination. It then adds in a separate section the best interest of the child as an additional factor that may be considered and weighed. As with stepparent adoptions, the best interest of the child may not be the sole basis for terminating a parent's rights. This conclusion is consistent with the constitutional and statutory parental preference doctrine. This is the better course; to

hold otherwise would invite courts to seek "better" families for any number of children whose family circumstances are challenging or financially difficult.

Because the petitioners failed to demonstrate by clear and convincing evidence any of the statutory factors listed in K.S.A. 2009 Supp. 59-2136(h)(1), we will not speculate how the district court reached the conclusion that it was in Baby Girl P.'s best interest not to live with her father. The factors that it discussed—that Devon could have done more to find out whether a child had been born and could have made financial arrangements for a child from whom he was legally cut off—cannot serve as the basis for termination.

Devon did not neglect his daughter. He made reasonable attempts both to support and to communicate with her. The record contains no clear and convincing evidence showing that Baby Girl P.'s best interest is not served by being part of her natural father's family. Given the strong preference in this state to preserve the ties between natural parents and their children, we are compelled to reverse the courts below and to restore the custodial relationship between the father and his daughter.

This is a case in which the requirement of upholding the constitutionally and statutorily protected interest of one party causes trauma for other parties, including a vulnerable child. In *Mississippi Choctaw Indian Band v. Holyfield*, 490 U.S. 30, 53-54, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989), the United States Supreme Court addressed the emotional toll that separating children from their custodial parents inflicts on both parents and children. We find that court's words apt for the present case and modify them here only to fit the facts specific to our case.

Years of developing family ties cannot be undone, and a separation at this point will doubtless cause considerable pain. Had the mandates of the statutory process been followed in 2008, much potential anguish might have been avoided, and in any case the law cannot be applied so as to automatically "reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." *Matter of Adoption of Halloway*, 732 P.2d 962, 972 (Utah 1986). It is not ours to say whether

the trauma that might result from removing these children from their adoptive family should outweigh the interest of the father—and perhaps the child herself—in having her raised by her natural father. *Mississippi Choctaw Indian Band*, 490 U.S. at 53-54.

The decision of the Court of Appeals affirming the district court is reversed. The decision of the district court is reversed. The case is remanded to the district court for the purpose of conducting proceedings effectuating a change of custody consistent with this opinion.

In remanding this matter, this court brings to the attention of the district court the potential traumatic impact of a sudden, precipitous separation of a child from the only parents she has ever known. This is one of the fortunately rare instances where one fervently wishes that the blindness of justice had at its disposal a judicial seeing-eye dog to guide it around a required outcome which may cause harm to a child. In recognition of the unavoidable repercussions of this order, this court urges the district court to create a process, occurring over a period of time not to exceed 30 days, for a custodial transition to occur. In addition to considering the duration of any such transitional process, the district court may in its discretion also consider including the participation of appropriate professional personnel.

PAUL E. MILLER, District Judge, assigned.

*   *   *

LUCKERT, J., concurring: I concur fully with the majority opinion but write separately to emphasize the distinctions between this case and *In re Adoption of A.A.T.*, 287 Kan. 590, 196 P.3d 1180 (2008), *cert. denied* 129 S. Ct. 2013 (2009). I am motivated to draw attention to the distinctions because it appears that the failure to recognize that a different analysis and statutes applied to the legal

questions raised in *Adoption of A.A.T.* than apply to the issues raised in this case contributed to, and perhaps caused, the erroneous decisions of the district court and the Court of Appeals. By writing separately and emphasizing the differences in the two cases, I hope to prevent future reliance on *Adoption of A.A.T.* in cases where a natural or putative father enters an appearance and asserts parental rights *during* an adoption proceeding.

The Kansas Legislature has created different standards for the termination of parental rights depending on whether a father appears and asserts custodial rights before an adoption is finalized. Because of this difference in standards, a simple fact of timing can mean that two natural fathers—such as the one in this case and the one in *Adoption of A.A.T*—may see their quest for parental rights reach different conclusions. This is true even though both fathers were falsely told that the pregnancy had terminated, were not identified by the mothers in information provided to either the adoption agency or the court, and attempted to assert parental rights upon learning of their respective child's birth. This difference, as we stated in *Adoption of A.A.T.*, is because " 'timing of the father's actions is the "most significant" element.' " *Adoption of A.A.T.*, 287 Kan. at 615 (quoting *Matter of Robert O. v. Russell K.* 80 N.Y.2d 254, 264, 590 N.Y.S.2d 37, 604 N.E.2d 99 [1992]). Under Kansas statutes, the difference in timing means different standards apply to the decision of whether to terminate the father's parental rights. The differences are explained by a review of the issues raised in *Adoption of A.A.T.*, which are not issues raised in this case, and then by a review of the differences in the statutory standards.

### *Issues in* Adoption of A.A.T. *Not Raised in This Case*

Because the natural father in *Adoption of A.A.T.* did not appear until 6 months after the adoption was finalized, the question in that case was whether the adoption was void, voidable, or should otherwise be set aside because the natural father did not receive notice of the adoption proceeding. Relying on decisions of the United States Supreme Court, we concluded that the due process rights to notice and an opportunity to be heard were not violated "as long

as the state's statutes provide a process whereby most responsible putative fathers can qualify for notice in an adoption proceeding." *Adoption of A.A.T.*, 287 Kan. at 614. We acknowledged that this can mean that a natural father's opportunity to develop a parenting relationship with his child ends with the finalization of a newborn child's adoption, even in situations where the father's failure to fully grasp his parenting opportunity was caused by the natural mother's fraud. Such a rule is constitutionally justified, we concluded, because of the various interests of the State in the finality of adoption decrees. The State's interests include "providing a child stability and security early in life, encouraging adoptions, protecting the adoption process from unnecessary controversy and complication, and protecting . . . [the natural mother's] privacy and [the adoptive family's] liberty interests." *Adoption of A.A.T.*, 287 Kan. at 614. As part of the analysis that led to that conclusion, we distinguished cases where the father, like Devon in this case, appeared during the adoption proceeding and asserted parental rights. *Adoption of A.A.T.*, 287 Kan. at 619.

Reviewing the Kansas Adoption and Relinquishment Act, K.S.A. 59-2111 through K.S.A. 59-2144, we concluded in *Adoption of A.A.T.* that the constitutional test was satisfied by the Kansas statutes. More specifically, we focused on 59-2136(e), which provides that "[i]n an effort to identify the father, the court shall determine by deposition, affidavit or hearing" whether a parent is entitled to notice because one of six legislatively defined circumstances exists. We concluded the statute provided a process whereby most responsible putative fathers can qualify for notice in an adoption proceeding. Nevertheless, the father in *Adoption of A.A.T.* did not meet any of the six conditions. *Adoption of A.A.T.*, 287 Kan. at 621.

The due process issue of whether a natural or putative father has a right to notice and the opportunity to be heard—the core issue discussed in *Adoption of A.A.T.*—was not at issue in this case. Devon appeared and had an opportunity to be heard in the adoption proceeding. Any overlap in the legal analysis of *Adoption of A.A.T.* and of this case, relates to the fact that both fathers had their parental rights terminated. But the factors and analysis related to that decision are entirely different because a different stan-

dard applies when a father appears during an adoption proceeding than applies when a father does not appear.

*Timing Means Different Statutes Regarding Termination of Parental Rights Apply*

In this case, K.S.A. 2009 Supp. 59-2136(h)(1) applies to the termination of Devon's parental rights. That provision begins by defining the cases where it applies—"[w]hen a father or alleged father appears and asserts parental rights." The provision then identifies a burden of proof and defines the factors to be considered by the court, stating in part:

"Thereafter, the court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of any of the following:

"(A) The father abandoned or neglected the child after having knowledge of the child's birth;

"(B) the father is unfit as a parent or incapable of giving consent;

"(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

"(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

"(E) the father abandoned the mother after having knowledge of the pregnancy;

"(F) the birth of the child was the result of rape of the mother; or

"(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition.

"(2) In making a finding whether parental rights shall be terminated under this subsection, the court may:

"(A) Consider and weigh the best interest of the child; and

"(B) disregard incidental visitations, contacts, communications or contributions." K.S.A. 2009 Supp. 59-2136(h)(1).

In contrast, as we explained in *Adoption of A.A.T.*, the Kansas Legislature has specifically stated that K.S.A. 2009 Supp. 59-2136(h) does not apply if a father does not appear. In such a case, the termination of parental rights is governed by K.S.A. 2009 Supp. 59-2136(g), which provides:

"If, after the inquiry, the court is unable to identify the father or any possible father and no person has appeared claiming to be the father and claiming custodial rights, the court shall enter an order terminating the unknown father's parental rights with reference to the child *without regard to subsection (h)*. If any person identified as the father or possible father of the child fails to appear or, if ap-

pearing, fails to claim custodial rights, such person's parental rights with reference to the child shall be terminated *without regard to subsection (h)*." (Emphasis added.)

Hence, the statutory provision that controls the outcome of this case was not part of the analysis in *Adoption of A.A.T.* Moreover, as we further explained in the *Adoption of A.A.T.*, the inapplicability of 59-2136(h) to an analysis also means that several principles from our case law do not apply. Citing a long line of cases, we noted: "When applying K.S.A. 59-2136(h), Kansas appellate courts have strongly endorsed the parental preference doctrine, required strict compliance, and diligently enforced the clear and convincing evidence standard." *Adoption of A.A.T.*, 287 Kan. at 625. In contrast, we concluded, the parental preference doctrine did not apply to terminations occurring under 59-2136(g). See *Adoption of A.A.T.*, 287 Kan. at 626.

The difference in the analytical framework is enormous. The outcome of this case is determined by the parental preference doctrine and the factors of K.S.A. 2009 Supp. 59-2136(h), neither of which had any impact on the termination of the father's parental rights in *Adoption of A.A.T.* I believe it is very likely that if the parental preference doctrine and the factors of K.S.A. 2009 Supp. 59-2136(h) had applied to the decision of whether the parental rights of the natural father in the *Adoption of A.A.T.* should have been terminated, the outcome of that appeal may have been the same as in this case. But that question was not decided because neither the doctrine nor the factors applied. Rather, because the father in *Adoption of A.A.T.* did not appear, under K.S.A. 2009 Supp. 59-2136(g), his parental rights were subject to termination with no further showing.

Finally, although there is some overlap among the statutory provisions indicating when notice must be given under K.S.A. 2009 Supp. 59-2136(e) and the factors for termination stated in K.S.A. 2099 Supp. 59-2136(h), we noted in *Adoption of A.A.T.* that the father in that case did not argue he met the criteria of 59-2136(e). Hence, the *Adoption of A.A.T.* court did not undertake a factual analysis. Consequently, even in that regard, courts should be cautious in relying on *Adoption of A.A.T.*, especially in light of the

differences in statutory language. Compare K.S.A. 2009 Supp. 59-2136(e)(5) ("whether the mother has received support payments or promises of support with respect to the child or in connection with such mother's pregnancy") with K.S.A. 2009 Supp. 59-2136(h)(1)(D) ("the father, after having knowledge of the pregnancy, failed with reasonable cause to provide support for the mother during the six months prior to the child's birth").

The decision and rationale of *Adoption of A.A.T.* should be limited to the legal question presented there: Whether a finalized adoption should be set aside because the natural father did not receive notice of the adoption proceeding. The reasoning and holding should not be extended to determinations of whether a natural father who appears before an adoption is finalized and asserts his parental rights should have those rights terminated.