NOT DESIGNATED FOR PUBLICATION

No. 116,582

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Adoption of BABY BOY W.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; KATHLEEN M. LYNCH, judge. Opinion filed May 12, 2017. Affirmed.

*Kurt L. James*, of Topeka, for appellant, natural father.

*Allan A. Hazlett*, of Topeka, for appellees, adoptive parents.

Before BRUNS, P.J., HILL and SCHROEDER, JJ.

*Per Curiam*:  The natural father, C.C., appeals the severance of his parental rights to Baby Boy W. We affirm the district court's ruling that (1) with knowledge of the pregnancy, C.C. failed to provide any reasonable financial support for the mother; and (2) with knowledge of Baby Boy W.'s birth, C.C. failed to provide any reasonable financial support for the child.

We also acknowledge the district court erred, although harmlessly, in finding C.C. was unfit as a parent since no evidence of unfitness was presented. Finally, under the facts of this case, C.C. failed to allege or present evidence the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 (2012) *et seq.*, applied. We affirm.

1

FACTS

In 2015, C.C. was briefly involved in a relationship with H.W., who became pregnant, and the two arranged to be married. However, the couple ended their relationship shortly thereafter, around the weekend of July 4, 2015. C.C. and H.W. continued to communicate frequently by text message until approximately mid-August when H.W. stopped responding to C.C.'s text messages. C.C. continued to send H.W. text messages through December 2015.

H.W. gave birth on February 4, 2016. She voluntarily relinquished her parental rights and gave custody of Baby Boy W. to St. Joseph Adoption Ministry. On February 5, 2016, the adoptive parents filed a petition for adoption requesting C.C.'s parental rights be terminated. C.C. filed an answer on February 24, 2016, requesting a DNA test to determine his parentage and, if he was the biological father, requesting the court deny the adoption and place temporary custody and care of Baby Boy W. with him.

Prior to the severance hearing, the adoptive parents filed proposed findings of fact and conclusions of law. The severance hearing occurred 2 days later on August 16, 2016. C.C. was the only person to testify. The district court filed its memorandum decision on August 26, 2016. It found C.C. provided no financial support to H.W. during the 6 months prior to the birth of Baby Boy W. It also found C.C. made no reasonable efforts to financially support or communicate with Baby Boy W. after having knowledge of his birth. The district court further found C.C. was unfit "with guidance from the factors outlined in the Kansas Code for the Care of Children at K.S.A. [2016 Supp.] 38-2269(b)(3) and (7)." As a result, the district court found "by clear and convincing evidence that the biological father's rights be terminated pursuant to [K.S.A. 2016 Supp.] 59-2136(h)(1)(C),(D) and [K.S.A. 2016 Supp.] 59-2136(h)(2)(A)."

C.C. timely appealed.

ANALYSIS

Pursuant to K.S.A. 2016 Supp. 59-2136(h)(1), a district court may terminate parental rights in an adoption proceeding if it finds, by clear and convincing evidence, *any* of the following:

"(A) The father abandoned or neglected the child after having knowledge of the child's birth;

"(B) the father is unfit as a parent or incapable of giving consent;

"(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

"(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

"(E) the father abandoned the mother after having knowledge of the pregnancy;

"(F) the birth of the child was the result of rape of the mother; or

"(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition."

When a district court terminates a parent's rights based on factual findings made under K.S.A. 2016 Supp. 59-2136(h)(1), those factual findings will be reviewed on appeal to determine if, after reviewing all the evidence in the light most favorable to the prevailing party, the findings were highly probable, *i.e.*, supported by clear and convincing evidence. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re B.B.M.*, 290 Kan. at 244.

Adoption statutes are strictly interpreted in favor of maintaining the rights of the natural parents where the statute is being used to terminate the right of a natural parent without consent. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168

(2010); *In re A.S.*, 52 Kan. App. 2d 173, 177-78, 364 P.3d 1203 (2015). The party seeking to terminate a parent's rights has the burden of proving termination is appropriate under K.S.A. 2016 Supp. 59-2136. *In re Baby Girl P.*, 291 Kan. at 430.

*No financial support for H.W. during the last 6 months of her pregnancy*

C.C. argues the district court erred when it terminated his rights for failing "without reasonable cause to provide support for the mother during the six months prior to the child's birth" pursuant to K.S.A. 2016 Supp. 59-2136(h)(1)(D) after having knowledge of H.W.'s pregnancy. Specifically, he argues the district court erred when it held K.S.A. 2016 Supp. 59-2136(h)(1)(D) required him to provide reasonable *financial* support.

A father has an affirmative duty to provide financial support for the mother during the 6 months prior to the child's birth. *In re M.R.C.*, 42 Kan. App. 2d 772, 779, 217 P.3d 50 (2009). A father is not required to provide total support for the mother during the last 6 months of pregnancy. However, the support provided cannot be incidental or inconsequential; it "must be of some consequence and reasonable under all of the circumstances." *In re Adoption of Baby Girl S.*, 29 Kan. App. 2d 664, 667, 29 P.3d 466 (2001), *aff'd* 273 Kan. 71, 41, P.3d 287 (2002). "This duty includes 'not only the [common-law] duty of financial support, but also the natural and moral duty of a parent to show affection, care and interest toward his or her child.' *In re Adoption of B.M.W.,* 268 Kan. 871, 873, 2 P.3d 159 (2000)." *In re Adoption of M.D.K.*, 30 Kan. App. 2d 1176, 1178, 58 P.3d 745 (2002). In a concurring opinion, Judge now Justice Beier elaborated on a father's duty to provide support to the mother during the 6 months prior to a child's birth, stating:

> "An unwed man who learns that his unwed sexual partner is pregnant and intends to carry the pregnancy to term has only one way to ensure he can exercise his parental

4

rights after the birth, regardless of whether the mother intends to exercise hers: He must relinquish possession and control of a part of his property or income to the mother-to-be during the last 6 months of the pregnancy so that she may use the items or money to support herself or prepare for the arrival of the child. He must do this regardless of whether his relationship with the mother-to-be continues or ends. He must do this regardless of whether the mother-to-be is willing to have any type of contact with him whatsoever or to submit to his emotional or physical control in any way. The birth may be the event that triggers a legal *obligation* of support, but it marks the end of the period when *voluntary* support can preserve the father-to-be's right to raise his child. He who hesitates truly is lost, and a lawyer who advises otherwise commits malpractice.

"Even in the most acrimonious of situations, a father-to-be can fund a bank account in the mother-to-be's name. He can have property or money delivered to the mother-to-be by a neutral third party. He can—and must—be as creative as necessary in providing material assistance to the mother-to-be during the pregnancy and, the law thus assumes, to the child once it is born. He must not be deterred by the mother-to-be's lack of romantic interest in him, even by her outright hostility. If she justifiably or unjustifiably wants him to stay away, he must respect her wishes but be sure that his support does not remain equally distant." 30 Kan. App. 2d at 1182-83 (Beier, J., concurring).

A mother's refusal of assistance may be considered as a factor when determining whether the father provided support for the mother during the last 6 months of her pregnancy. 30 Kan. App. 2d at 1179-80. However, her failure to act on a general offer of support by telling the father what she specifically needs does not amount to a refusal of support. 30 Kan. App. 2d at 1180.

The district court's findings, when viewed in the light most favorable to the adoptive parents, were supported by clear and convincing evidence. C.C. concedes he did not provide financial support for H.W. during the 6 months before she gave birth to his child. Instead, he argues he "provided or tried to provide emotional support to the mother, and on repeated occasions, offered her financial support." The record indicates C.C. told H.W. that, had she told him her electricity had been shut off, he "would have helped" her.

5

Otherwise, however, the record indicates C.C. made only general offers of financial support.

Similarly, the record reflects C.C. sent H.W. numerous text messages letting her know he was thinking about her and the baby, conveying his affection for her, and expressing his excitement for the baby. However, the record does not contain any specific offers of emotional support. Indeed, rather than offering support, many of C.C.'s messages are simply attempts to reconcile with H.W. or attempts to check on the baby. In addition, although C.C. continued sending H.W. text messages through at least late December 2015, it appears H.W. stopped responding in mid-August 2015. The record is silent on whether H.W. received any of his messages thereafter.

*"Without reasonable cause"*

C.C. also argues the district court erred because it failed to find reasonable cause existed excusing his failure to support H.W. during the final 6 months of her pregnancy. He contends the adoptive parents had the burden of proving he failed to provide support "without reasonable cause" and they failed to meet their burden. He also contends there was reasonable cause for his failure to provide H.W. with financial support during the last 6 months of her pregnancy.

The petitioner (here, the adoptive parents) has the burden to show the father failed to provide support to the mother during the last 6 months of her pregnancy without reasonable cause. *In re B.B.M.*, 290 Kan. at 243. The Kansas Supreme Court elaborated:

> "If the alleged ground for termination is K.S.A. 2009 Supp. 59-2136(h)(1)(D)—that the
> father 'failed without reasonable cause to provide support' for the mother during the last 6
> months of her pregnancy—then the burden includes meeting the unsurprising possibility
> that a father may argue that any failure on his part was justified by a mother's

6

interference. This process does not require a petitioner to demonstrate irrefutably an impossible negative; it requires only that the petitioner do what is ordinary for a party who bears a clear and convincing burden of proof, *i.e.,* show that his or her version of the facts is highly probable. See *In re B.D.-Y.,* 286 Kan. 686, 690-98, 187 P.3d 594 (2008). This showing, to be successful, often must anticipate the argument of the opponent and undercut it with contrary evidence. This certainly is not asking too much of a party who wishes to terminate what may ripen into a natural father's fundamental right to care, custody, and control of his child. See *A.A.T.,* 287 Kan. at 600-12; *In re Adoption of B.M.W.,* 268 Kan. [at 881]." *In re B.B.M.*, 290 Kan. at 243.

An appellate court does not reweigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re B.B.M.*, 290 Kan. at 244. The district court found:

"1. [C.C.] provided no financial support for [H.W.] during the six months prior to the birth of the child. There was no evidence of any financial support provided to the mother six months prior to the birth of the child. The father testified he was working for cash but never provided any of that cash to the Biological Mother by any means. Despite working for cash, the Father testified that he set up a nursery in his home with everything necessary for the child. Setting up the nursery included, but not limited to, buying furniture, newborn clothes and diapers. These purchases were for his home and were not provided to the mother. He did send a text which said in part, 'if I can help and I am able to financially I most definitely will. . . . ' He also testified that he did not offer the mother 'money of a specific duration [*sic*].' Further, he testified that he went to work in January[] 2016 for Country [M]art. Therefore, he had funds that he could have provided to the mother before the birth of the child."

C.C. concedes he did not provide any financial support during the final 6 months of H.W.'s pregnancy. However, C.C. contends the adoptive parents did not meet their burden because he had reasonable cause for his failure to provide financial support to H.W. during the last 6 months of her pregnancy.

7

For support, he points to text messages H.W. sent him telling him it was not his responsibility to help her and she wanted to be alone. C.C.'s brief ignores the true context of the text message conversations. H.W. informed C.C. her electricity had been shut off, it cost her $200 to get it turned back on, and she stayed with her parents while the electricity was off. C.C. replied, "[H.W.,] why did you not let me know from your mom's phone or something that you needed help I would have helped you I'm sorry you have had to go through that." In another message, C.C. told H.W., "I would like to help if [I] can." H.W. replied, "It's not ur [*sic*] responsibility to help me, [C.C.]" C.C. did not identify how he would have helped, merely that he would like to help. Similarly, H.W. did not refuse C.C.'s offer of help, she simply told him it was not his responsibility. Further, although H.W. told C.C. she just wanted to be alone all the time as a result of depression, he continued to text her for the next 6 months. The district court did not err when it failed to find these text messages established reasonable cause for his failure to provide reasonable support to H.W.

Similarly, he argues reasonable cause for his failure to support H.W. existed because he had no idea where she was living. Yet his attorney was able to hand-deliver a letter to H.W. at her address in Jefferson County. Simply put, this does not amount to reasonable cause. See *In re M.R.C.*, 42 Kan. App. 2d at 779-80 (district court did not err when it terminated father's rights for failing to support mother during last 6 months of her pregnancy despite protection from abuse order because father did not attempt to get money to her through friends or family or attempt to open bank account for mother).

C.C. also argues since H.W. was working long hours making more than $20 an hour, it was clear she did not need financial support. However, on August 11, 2015, H.W. sent C.C. a text message which stated: "[C.C.,] I don't know how I'm going to take care of this baby. U can't provide nething [*sic*] for it, financially and there's just no way I can." Further, Kansas courts have held a father's duty to provide for the mother is not contingent on her being destitute. See *In re Adoption of Baby Boy S.*, 22 Kan. App. 2d

119, 133, 912 P.2d 761 (1996) (Kansas law does not require an unwed father to provide support only if the mother has no other source of financial support); *In re Adoption of Baby Boy W.*, 20 Kan. App. 2d 295, 299-300, 891 P.2d 457 (1994) ("We further hold to be without merit the father's alternative argument that he was not required to provide support to the mother because she was a minor who was supported by her mother and was receiving assistance from the adopting parents. K.S.A. 1993 Supp. 59-2136(h)(4) contains no such qualifying language.").

Finally, C.C. argues his below-average sophistication and intelligence is a factor which should be considered in determining whether reasonable cause existed for his failure to support H.W. during the final 6 months of her pregnancy. He provides no support for his assertion, nor does he explain why his below-average sophistication and intelligence constitutes reasonable cause for failing to provide some support for H.W. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is akin to failing to brief the issue. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015).

Viewed in the light most favorable to the adoptive parents, there is clear and convincing evidence supporting the district court's decision to terminate C.C.'s parental rights pursuant to K.S.A. 2016 Supp. 59-2136(h)(1)(D). C.C. made only general offers of financial support while having the ability to contribute financially. In addition, what C.C. points to as "emotional support" was not for the child and is better characterized as attempts to reconcile with H.W. Thus, the district court properly applied K.S.A. 2016 Supp. 59-2136(h)(1)(D) to the facts of this case to support the termination of C.C.'s parental rights.

9

*No reasonable efforts to support Baby Boy W.*

Pursuant to K.S.A. 2016 Supp. 59-2136(h)(1)(C), a father's rights may be terminated if the district court finds, by clear and convincing evidence, "the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth." Here, the district court found:

"2. [C.C.] made no reasonable efforts to support the child after having knowledge of the child's birth. [C.C.] testified that he had not established a savings account for the child. He claimed he started to but used the funds for other purposes. Upon further questioning he admitted that he used the money to pay his counsel's retainer. He stated that the picture of him holding twenty-two one hundred dollar bills, was the money he paid for the retainer for his attorney. . . . The father further testified that after the child's birth he never handed the Biological Mother any money. He stated that he thought it was best not to contact her [and] that he did not know providing support after the child was born 'was an option.'

"Although the Biological Father never paid any support for the child after the child's birth on February 4, 2016, he did pay $6000 dollars to the state of Texas on March 15, 2016. He made the payment so he could be released from parole. He was not required to make a lump sum payment. He chose to do so. The Petitioners introduced the bank statements of the Biological Father. The bank statements also make it clear that the father had money available to him but he made no reasonable effort to provide it to the petitioners for support of the child.

"The father testified that he won $500 dollars at a Casino and none of that money was provided to the Biological Mother or petitioners.

"3. The father made no reasonable efforts to communicate with the child after having knowledge of the child's birth. The father did not provide gifts for the child, he did not write letters or cards to the child or attempt any communication with the child. The father did not request parenting time with the minor child. Although he testified that he requested parenting time in his Answer filed with the court, a review of the pleading reveals that testimony is not correct. Again, it is undisputed that a paternity action was never filed by the Biological Father."

On appeal, C.C. argues the $2,200 he saved—which he spent to retain a lawyer just before Baby Boy W.'s birth—should be considered in determining the reasonableness of his failure to support or communicate with the child. He contends his request for temporary placement of the child on February 24, 2016, "constituted a reasonable effort on his part to communicate with or support the child." He also argues "the statute should not be read as requiring the father to invade the privacy of adoptive parents with whom he is currently involved in often very hostile litigation." However, these arguments are without merit.

First, K.S.A. 2016 Supp. 59-2136(h)(1)(C) concerns a father's support or communication *after the birth of the child*. Thus, by the plain language of the statute, the $2,200 C.C. saved—and spent—before Baby Boy W.'s birth is irrelevant to this determination. In contrast, the $6,000 C.C. paid to the State of Texas to be released from parole is relevant because it was money which C.C. could have used to provide support for the child.

Second, while C.C. requested temporary custody of the child in his answer on February 24, 2016, he did not renew his request or ask the district court to rule on his request for temporary custody. Similarly, C.C. never filed a paternity action despite retaining an attorney before Baby Boy W. was born. More than 7 months passed between Baby Boy W.'s birth and the hearing to terminate C.C.'s parental rights. Though the district court never ruled on C.C.'s request for temporary custody, he did not make the reasonable effort of setting the request for hearing and decision.

Finally, we note C.C. could have provided support for Baby Boy W. without invading the privacy of the adoptive parents. Funds could have been sent to the adoption agency or the adoption attorney to forward to the adoptive parents. This would not have required C.C. "to do something that the child's custodians patently do not want him to do." Nor would it have been a Herculean task. Despite this, C.C. made no effort to

11

provide reasonable financial support for Baby Boy W. The district court properly applied K.S.A. 2016 Supp. 59-2136(h)(1)(C) to the facts of this case to support termination of C.C.'s parental rights.

*The district court found C.C. unfit, but terminated his parental rights for nonsupport.*

C.C. spends a substantial portion of his brief arguing the district court erred when it found him unfit and terminated his parental rights as a result. He raises due process concerns, a venue issue, and sufficiency of the evidence. However, while the district court did find C.C. unfit pursuant to K.S.A. 2016 Supp. 38-2269(b)(3) and (7), the district court did not rely on C.C.'s unfitness when it terminated his parental rights.

The record reflects the district court found "by clear and convincing evidence that the biological father's rights be terminated pursuant to [K.S.A. 2016 Supp.] 59-2136(h)(1)(C),(D) and [K.S.A. 2016 Supp.] 59-2136(h)(2)(A)." The district court's order makes no reference to K.S.A. 2016 Supp. 59-2136(h)(1)(B), which states a father's parental rights may be terminated if "the father is unfit as a parent or incapable of giving consent." As such, even if the district court erred in finding C.C. unfit, since the district court did not rely on that error to terminate C.C.'s parental rights, he is not entitled to relief on the issue; and we determine the error to be harmless, and there is no need to elaborate further. See *State v. Cousins*, No. 112,497, 2015 WL 4879202, at *7 (Kan. App. 2015) (unpublished opinion) ("Because the district court did not rely upon testimony about the polygraph to support its ruling, we need not address the polygraph issue to determine whether the district court correctly suppressed Cousins' statements."), *rev. denied* 303 Kan. 1079 (2016).

C.C. also argues the district court erred when it terminated his parental rights pursuant to K.S.A. 2016 Supp. 59-2136(h)(2)(A), the subsection allowing courts to consider and weigh the best interests of the child when considering terminating parental

12

rights. The "best interests of the child" is not an independent ground for termination of parental rights. *In re Adoption of D.D.H.*, 39 Kan. App. 2d 831, Syl. ¶ 2, 184 P.3d 967 (2008). However, the district court also found C.C.'s parental rights should be terminated for failing without reasonable cause to provide financial support to the mother during the last 6 months of her pregnancy and failing to make reasonable efforts to provide financial support or communicate with the child after having knowledge of the child's birth. Since clear and convincing evidence supports those findings, even assuming C.C. is correct and the district court improperly considered K.S.A. 2016 Supp. 59-2136(h)(2)(A) as an independent grounds for termination of his parental rights, the error is harmless. The district court terminated his parental rights pursuant to K.S.A. 2016 Supp. 59-2136(h)(1)(C) and (D), and either of those findings, standing alone, is sufficient to terminate his parental rights.

*C.C. was not denied due process and venue was proper.*

C.C. alleges he was denied due process when the district court terminated his parental rights due to unfitness because he did not receive notice of the adoptive parents' intent to challenge his fitness and, as such, did not have the opportunity to present a defense. C.C. raises this issue for the first time on appeal.

Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014). However, there are several exceptions to the rule that a new legal theory may not be asserted for the first time on appeal, including: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *In re Estate of*

13

*Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008). "Natural parents *who have assumed their parental responsibilities* have a fundamental right, protected by the United States Constitution and the Kansas Constitution, to raise their children." (Emphasis added.) *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010). Here, the record reflects C.C. never assumed his parental responsibilities, but in the interest of justice, we will consider the issue to ensure a fundamental right was not denied.

C.C. contends the adoptive parents did not provide him sufficient notice to satisfy due process since neither the petition nor H.W.'s affidavit alleged his unfitness. Instead, his unfitness was raised for the first time in the adoptive parents' proposed findings of fact and conclusions of law filed 2 days before the trial. C.C. likens this to "trial by ambush," which "should not be tolerated."

C.C. agreed to be deposed on July 7, 2016. As part of his deposition, C.C. was to bring with him:

> "1. Copies of all probation, parole, diversion or like or similar orders that you are or have been subject to since you became an adult.
> . . . .
> "6. Proof of all child support payments for any and all of your children for the last two years.
> "7. Names, addresses, and counselors for all drug, alcohol, or mental health facilities you have attended in the last three years, including, but not limited to Atchison Valley Hope, New Dawn, Sims-Kemper, and Mirrors."

Additionally, in their witness list filed July 15, 2016—more than a month before the hearing—the adoptive parents identified his probation officers, counselors from Sims-Kemper, H.W., and numerous witnesses to C.C.'s involvement with a July 1, 2015, shooting, as potential witnesses. The witness list also identifies as exhibits:

14

"6. Text messages with [H.W.] for the past year.

"7. Forfeiture documents, JA CO 09CV32.

"8. Drug convictions documents JA CO 09CR95.

"9. False Statement Conviction, TX MR2C1408559.

"10. Assault Causes Bodily Injury Family Member TX MR2C1408778.

"11. Assault Causes Bodily Injury Family Member TX MR2C 1408558.

"12. Bell County, TX Case #272601-E protective order documents.

"13. Bell County, TX Case #73418 re:  Possession Firearm by convicted felon.

"14. JA CO 15LM056 documents.

"15. SN CO 16LM2743 documents.

"16. SN CO 15LM9719 documents.

"17. Divorce documents from [S.C.].

"18. Probation documents from TX to KS transfer.

"19. Employment records Penn Place, County Mart, and CBC, Inc.

"20. Clinical records from Sims-Kemper."

The record reflects that through the discovery process of the proceeding, C.C. knew or should have known his fitness would be at issue long before the adoptive parents filed their proposed findings of fact and conclusions of law. We are persuaded C.C. was adequately provided notice and there was no due process violation. He also briefly complains about venue, alleging it "exacerbated" the due process violation but fails to acknowledge K.S.A. 2016 Supp. 59-2136(e) and K.S.A. 59-2126, which establish venue was proper. We need not address the issue further.

*The evidence was insufficient to support a finding of unfitness.*

The district court found:

"The biological father has a long history of involvement with the criminal justice system. The earliest cases date back to his teens to the most recent criminal action in Texas. Also, there was testimony concerning the father's long history of drug and alcohol use. He also testified that he broke his sobriety on July 13, 2016. The biological father

15

also admitted that he was involved in what can best described as a rolling gun battle in Topeka in an attempt to retrieve a friend's property that had been stolen. With each of these incidents there is an inability of the biological father to accept responsibility for his actions and instead places blame on another circumstance or person. (See the testimony of the father in the Petitioner's case in chief.) Consequently, this court finds that the father should be found unfit with guidance from the factors outlined in Kansas Code for the Care of Children at K.S.A. [2016 Supp.] 38-2269(b)(3) and (7)."

Pursuant to K.S.A. 2016 Supp. 38-2269(b)(3), "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental, or emotional needs of the child" is a factor the court may consider when terminating parental rights. Similarly, the "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family" may be considered. K.S.A. 2016 Supp. 38-2269(b)(7).

Contrary to C.C.'s assertion, he *did* testify regarding a relapse on July 3, 2016, stating he had "a couple alcoholic beverages" with the pastor of his church and a few others, but stopped after four beers. Despite this, the district court erred when it found C.C. unfit pursuant to K.S.A. 2016 Supp. 38-2269(b)(3) because there was no evidence presented regarding whether C.C.'s drug or alcohol use rendered him incapable of caring for his child's physical, mental, or emotional needs. In fact, C.C. testified he had cared for his two other children for all but 4 days in the past 2 months. He said he cared for his two other children at least 75-80% of the time. In addition, C.C. did not testify about any other relapses with alcohol after December 2015. He also indicated he had not had a relapse with narcotics and had not used illegal narcotics since 2014.

Since there is no clear and convincing evidence C.C.'s past drug or alcohol use rendered him incapable for caring for his child's physical, mental, or emotional needs, the district court erred when it found him unfit under K.S.A. 2016 Supp. 38-2269(b)(3). Similarly, the district court erred when it found C.C. was unfit under K.S.A. 2016 Supp.

16

38-2269(b)(7) because there was no evidence any public or private agencies were attempting to *rehabilitate* the family.

Since the district court did not terminate his parental rights pursuant to K.S.A. 2016 Supp. 59-2136(h)(1)(B) or the portion of the adoption statutes allowing termination of parental rights for unfitness, K.S.A. 2016 Supp. 38-2269(b)(7), the district court's error is harmless. Further, as previously discussed, there is clear and convincing evidence supporting the district court's termination of C.C.'s parental rights for failing, without reasonable cause, to financially support the mother during the 6 months prior to the child's birth and failing to make reasonable efforts to financially support or communicate with the child after knowledge of the child's birth. As a result, although the district court erred when it found C.C. unfit, it was harmless and he is not entitled to relief.

*The Indian Child Welfare Act, 25 U.S.C. § 1901 (2012)* et seq., *does not apply.*

C.C. was asked about a post on Facebook indicating he was excited to serve time for his driving under the influence conviction because it would give him time to "check on the boys on the inside." C.C. replied, in part:

> "I did grow up in and out of group homes, yes. The statement as far as boys on the inside is yes, *there were two Native American gentlemen from my reservation* that I know that also serve every weekend, so yeah, I have not seen them in multiple years." (Emphasis added.)

With this disclosure, C.C. argues the district court failed to adequately inquire regarding the possible application of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 (2012) *et seq.*, since Holton is in close proximity to several Indian reservations. In support, he cites *In re S.M.H.*, 33 Kan. App. 2d 424, Syl. ¶ 5, 103 P.3d 976 (2005), which states, in part:

17

"Because the language in K.S.A. 2003 Supp. 38-1503(a) is clear that the Child in Need of Care code does not apply to Indian children and the ICWA does, once the court was faced with evidence that the children in this case were Indian children, the court was bound to apply the ICWA in these proceedings."

C.C. did not raise this issue before the district court. Issues not raised before the trial court cannot be raised on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011). Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. In *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014), the Supreme Court held that litigants who fail to comply with this rule risk a ruling that the issue is improperly briefed and will be deemed waived or abandoned. Thereafter, the Supreme Court held that Rule 6.02(a)(5) would be strictly enforced. *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). C.C. has not complied with Supreme Court Rule 6.02(a)(5), and with his lack of briefing, we deem the claim waived or abandoned.

However, in light of the claim and judicial fairness under the facts of this case, we find *In re S.M.H.* is distinguishable. In *In re S.M.H.*, the State filed a child in need of care action. The mother indicated the children were registered with the Pottawatomie Nation Indian Tribe. Although the Pottawatomie Indian Nation did not intervene, the Cherokee Nation filed a notice of intervention indicating the children were Cherokee Indian children. Despite this, the district court did not apply the ICWA, and found the children were in need of care. Since the district court did not apply the ICWA, this court reversed the district court because the mother did not receive the protection of the higher evidentiary standard she was entitled to receive. 33 Kan. App. 2d at 441.

Here, H.W. alleged neither she nor C.C. had Indian heritage. The petition indicated the ICWA did not apply. C.C.'s answer did not contest H.W.'s allegation that the ICWA did not apply. Further, C.C. never alleged in any of his pleadings that the

18

ICWA applied. At the parental severance trial, C.C. did not allege the ICWA applied. In fact, other than C.C.'s response above, there is no indication the ICWA could apply. Further, on appeal, it is important to note C.C. does not allege Baby Boy W. is an Indian child or that the ICWA applies. Instead, he argues his testimony about "two Native American gentlemen from [his] reservation" was "sufficiently specific about his *possible* Indian status as to require further inquiry from the court." (Emphasis added.)

Based on the evidence before us, we cannot see how the ICWA applies, and C.C. has not actually alleged the ICWA applies, merely that the district court failed to determine if the ICWA applied. H.W. and the adoptive parents repeatedly alleged the ICWA did not apply and C.C. did not controvert those allegations. Unlike the evidence in *In re S.M.H.*—which included both a parent's allegation the children were Indian children and a notice of intervention from the Cherokee Nation—C.C.'s brief reference to "[his] reservation" during testimony on an unrelated matter was insufficient to require further inquiry by the district court into the ICWA's applicability.

CONCLUSION

Given the totality of the evidence reflecting C.C.'s failure to provide reasonable financial support for the mother after having knowledge of the pregnancy or any reasonable financial support for Baby Boy W. after his birth, the district court did not err in terminating C.C.'s parental rights.

Affirmed.

19