NOT DESIGNATED FOR PUBLICATION

No. 117,842

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of
BABY BOY M,
A Minor Child.

MEMORANDUM OPINION

Appeal from Nemaha District Court; JOHN L. WEINGART, judge. Opinion filed December 1, 2017. Affirmed.

*Meghan K. Voracek*, of O'Keefe Law Office, of Seneca, for appellant father.

*Allan A. Hazlett*, of Topeka, for appellees.

Before BUSER, P.J., BRUNS, J., and STUTZMAN, S.J.

PER CURIAM: Baby Boy M. was born in the state of Maine. On May 26, 2017, as part of an adoption proceeding in Kansas, the Nemaha District Court entered an order terminating putative father J.D.'s parental rights and found his consent to Baby Boy M.'s adoption was not required. J.D. timely appealed that order and raises three issues: (1) whether the district court had jurisdiction to hear the case; (2) whether the district court committed error when it denied his request for an order for paternity testing; and (3) whether clear and convincing evidence supported the district court's findings. We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

Around the time of Baby Boy M.'s conception, J.D. had a brief sexual involvement with N.M. Approximately one month after the two ended their brief involvement, J.D. learned that N.M. was pregnant, although he did not know how long she had been pregnant. J.D. was without a permanent residence and without steady employment during and after N.M.'s pregnancy. Baby Boy M. was born in the state of Maine in November 2016, with the prospective adoptive parents, who were residents of Kansas, present for the birth. On the day of the child's birth, N.M. signed a Power of Attorney for Care and Custody of Infant Child authorizing the adoptive parents to act as her attorneys-in-fact.

N.M. consented to the adoption and three days later signed a request through the Interstate Compact on the Placement of Children (ICPC), K.S.A. 38-1201 et seq., asking the Maine ICPC administrator to request approval from the Kansas ICPC office for placement of the child with the prospective adoptive parents in Kansas. The ICPC administrator in Maine requested that approval on November 8, 2016, and the Kansas ICPC office approved the placement the next day. The child then traveled to Kansas with the prospective adoptive parents. J.D. learned of the child's birth around three weeks after Baby Boy M. was born, which was after the child had left the state of Maine.

On November 23, 2016, a petition for adoption and termination of the putative biological father's parental rights was filed in the Nemaha District Court. Not long after the petition was filed, the adoptive parents learned that J.D. was the putative father and, with that information and his last known address, notice was sent to J.D. of a December 30, 2016 hearing before the district magistrate judge.

In mid-December J.D. sent a letter to the court in which he objected to the termination of his parental rights. In the letter, he claimed he was Baby Boy M.'s father and stated he wanted the child returned to Maine to be placed with N.M.'s mother. J.D.

provided a letter from N.M.'s mother, which stated she was raising a seven-year old grandson and wanted Baby Boy M. returned so she could raise him too. In another letter from J.D., he called the child by a name other than his given name and claimed the child was born in late October. J.D. also claimed he and N.M. previously established that if she could not raise the child, he would be placed with J.D.'s parents. In a letter from J.D.'s mother, she stated she was raising three other grandchildren and had been doing so for eight years. J.D.'s mother said she also wanted to raise this child.

In December, in Maine, J.D. filed his own petition with a court. Although the record is unclear, it appears J.D.'s petition asked the court in Maine to assert jurisdiction over Baby Boy M. to bring the child back to Maine for either custody with J.D. or placement with a biological grandmother. The court in Maine eventually dismissed J.D's petition.

Back in the Kansas case, J.D. received discovery requests from the prospective adoptive parents. He signed responses to requests for admissions, although he claimed he completed and signed them "under duress." In his responses, J.D. admitted to being the father of the child, denied the child's name and birthdate, and admitted he knew of the pregnancy six months before birth. He also admitted he had been convicted of unlawful sexual contact with a child under the age of 12, had been imprisoned for the offense, and consequently was also a lifetime registrant with the Maine Sexual Offender Registry.

The record shows J.D. entered a plea of guilty in June 2008 to the unlawful sexual contact crime, a felony, based on acts occurring in 2006. He was sentenced to serve five years in prison, three of which were suspended, received six years of probation, and was ordered to register as a sex offender for his lifetime. J.D. violated the terms of his probation multiple times by failing to complete his required sex offender counseling, for contacts with children under the age of 16, and for new criminal conduct. His probation was "partially revoked" three times between 2010 and 2012. In late 2012, J.D. again

failed to complete a required sex offender counseling session when he told his counselor he was "all done with treatment," that he "was tired of all this," and said he wanted to return to prison to do his time. He was then arrested and transported to jail. The record lacks information regarding the subsequent disposition of that incident or whether he served the balance of his prison sentence.

As part of a July 2016 psychosexual risk assessment, J.D. disclosed he had reentered sex-offender treatment, that he had been in seven relationships in 2016, and had a daughter who lived with her mother. As of August 2016, that daughter, nearly two years old, was in the custody of the state of Maine. J.D. claimed he was not subject to a child support order in Maine for his daughter, but that he set up an account in her name. Although J.D. showed improvement between a May 2015 assessment and the one in July 2016 and was considered to be a good candidate for therapy, he was determined to be "a risky individual when it comes to repeat sex offending." As of December 2016, J.D. was intermittently noncompliant with his sex offender registration requirements for failing to timely return required forms and fees.

The trial on the petition for adoption was scheduled for January 20, 2017, and notice again was sent to J.D. at his last known address. He appeared by telephone and requested an attorney. The request was granted, counsel was appointed, and the trial before the district magistrate was continued to March 10, 2017. On March 7, 2017, J.D. filed a motion to transfer jurisdiction to Maine, claiming N.M. knew J.D. was the father of the child when she was pregnant and arguing that appearing in Kansas presented a hardship for him. J.D. also objected to the petition and claimed he wanted to retain parental and decision-making rights but have the child live with either the paternal or maternal grandmother. He claimed he worked for five employers and could provide for the child.

4

The trial before the district magistrate judge took place on March 10, 2017. J.D. and his out-of-state witnesses were permitted to participate and testify by telephone. There was no record made of that trial. On March 22, 2017, the magistrate issued an order terminating J.D.'s parental rights. In that order, the magistrate found that J.D.: "was not claiming 'custodial rights' as required by K.S.A. 59-2136(g);" that his lifetime registration requirement as a sex offender, his homelessness, and his being without adequate and secure income, made him unfit as a parent, supporting termination under K.S.A. 2016 Supp. 59-2136(h)(1)(B); and that after having knowledge of the pregnancy, J.D. failed, without reasonable cause, to provide support for N.M. in the six months prior to the child's birth, supporting termination based on K.S.A. 2016 Supp. 59-2136(h)(1)(D). The magistrate further found that, as J.D. and his witnesses testified he provided $40 in maternity clothes and a possible $20-$60 on two occasions during N.M.'s pregnancy, his support of N.M. was incidental and therefore may be disregarded under K.S.A. 2016 Supp. 59-2136(h)(2)(B). Several days later, the magistrate judge issued a decree of adoption.

In his appeal to the district court, J.D. again sought a transfer of jurisdiction and filed a motion for a paternity test. J.D. argued his motion for testing had merit because N.M. had signed an affidavit representing that she did not know the name of Baby Boy M.'s father and he wanted verification of his paternity before he proceeded with an appeal of the magistrate judge's decision.

At the trial before the district court on May 15, 2017, the district judge denied the motions for transfer and paternity testing; heard testimony from J.D., his mother, her long-term boyfriend, and J.D.'s fiancée; and ruled on the petition from the bench. The judge found that jurisdiction and venue were proper in Nemaha County, Kansas, that the requirements of the ICPC had been met prior to bringing the child to Kansas from Maine, that J.D. repeatedly claimed to be the father of the child and had actual knowledge of the pregnancy, and that J.D. testified contrary to documents in evidence, which significantly

5

affected his credibility. The district court further found that J.D. was claiming custodial rights for the first time, but his parental rights would not be terminated because he had not claimed custodial rights earlier.

Also, the district judge found that, having knowledge of the pregnancy, J.D. failed, without reasonable cause, to provide support for N.M. during the six months prior to giving birth. The court held that any support J.D. claimed to provide was "de minimus" and did not rise to the level of support necessary, and found the explanations J.D. offered about why he did not provide support were not believable. Finally, the court found that J.D. was unfit as a parent, based on: (1) the requirement that he register for life on Maine's sex offender registry for his conviction for unlawful sexual contact; (2) his homelessness; and (3) his failure to provide support. Based on its findings, the court held J.D.'s parental rights were terminated and his consent to the adoption was not required. The district judge accepted and adopted by reference the petitioners' proposed findings.

J.D. timely appealed from the district court order.

ANALYSIS

J.D. presents three issues: (1) a challenge to the district court's jurisdiction; (2) a claim that the district court committed error when it denied his request for an order for paternity testing; and (3) a contention that the district court lacked clear and convincing evidence to support its findings. We address them in that order.

*Jurisdiction*

As an initial matter, we note that J.D. cites no authority for his jurisdiction argument. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority, or in the face of contrary authority, is tantamount

6

to failing to brief the issue. *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015). Nevertheless, we will consider his claims, as "[a]n appellate court exercises unlimited review over jurisdictional issues and has a duty to question jurisdiction on its own initiative." *Wiechman v. Huddleston*, 304 Kan. 80, 84, 370 P.3d 1194 (2016).

J.D. centers his jurisdiction argument on two instances when he asserts N.M. did not list him as the father or putative father of Baby Boy M. The first was on November 7, 2016, when his name did not appear in the blank on a form titled "Interstate Compact on the Placement of Children Request." The second was in a "Birth Mother's Affidavit" signed by N.M. on November 11, 2016, in which she represented that at the time the child had been conceived she had engaged in sexual intercourse with one unknown male who was the only possible biological father, that no man had supported her for the six months prior to birth, and that she knew of no person claiming to be the child's father or claiming custodial rights. In the affidavit N.M. also claimed she had no information about the unknown man's "area of residence." J.D. argues the "false information provided by [N.M.] when signing documentation for the adoption case . . . invalidates the ICPC process."

*The ICPC Request*

As J.D. points out, there was a place in "Section I—Identifying Data" on the ICPC request form for "Name of Father," and that space was empty on the form with N.M.'s signature. However, he provides neither analysis nor authority to support his argument that, as an unadjudicated putative father, the omission of his name deprived the district court of jurisdiction to hear the adoption case. He does direct us to the ICPC requirement that the notice of intention to send a child to another state "shall contain . . . [t]he identity and address or addresses of the parents." K.S.A. 38-1202, Art. III(b)(2). And, while the ICPC provides penalties for sending a child in violation of the terms of the compact, the

7

record contains no suggestion that J.D. or any other person undertook any action under the compact to allege and prove the violation he claims. Moreover, J.D. points to no evidence in the record that identifies the person who prepared the ICPC request, nor is there citation to evidence that describes the circumstances of N.M.'s signing.

Finally, the ICPC provides that a "sending agency," defined to include a party's state, retains jurisdiction over a child, including the authority to cause the child to be returned, until an adoption is completed. K.S.A. 38-1202, Art. V(a). J.D. noted in his brief that while the adoption was pending in Kansas he filed an action in a court in Maine asking that the case concerning the child be "transferred" from Kansas to Maine. J.D. stated the court in Maine denied his request during the week prior to the trial in Kansas, apparently declining to exercise the authority it held through the ICPC.

*Birth mother's affidavit*

J.D.'s claims about N.M.'s statements in the affidavit that she filed with the adoption case bear similarities to his claims about the omission on the ICPC request form—the questioned statements are undeniably present in the document, but J.D. fails to provide authority or analysis to support his claim that the alleged falsehoods deprived the district court of its jurisdiction. Instead, J.D. lays out the reasons he would be disadvantaged by having the adoption case heard in Kansas. The affidavit shows it was signed and verified on November 11, 2016, two days after the Kansas ICPC office approved Baby Boy M.'s placement in Kansas.

"Because adoption is not recognized under common law, it is wholly a creature of statute." *In re Adoption of I.M.*, 48 Kan. App. 2d 343, Syl. ¶ 1, 288 P.3d 864 (2012). Those statutory provisions in Kansas are gathered into the Kansas Adoption and Relinquishment Act (KARA), K.S.A. 59-2111 et seq. Jurisdiction is addressed within KARA at K.S.A. 59-2127:

8

"(a) A court of this state may not exercise jurisdiction over a proceeding for adoption of a minor if at the time the petition for adoption is filed a proceeding concerning the custody or adoption of the minor is pending in a court of another state exercising jurisdiction substantially in conformity with the uniform child custody jurisdiction act, or the uniform child custody jurisdiction and enforcement act, or this act unless the proceeding is stayed by the court of the other state.

"(b) If a court of another state has issued a decree or order concerning the custody of a minor who may be the subject of a proceeding for adoption in this state, a court of this state may not exercise jurisdiction over a proceeding for adoption of the minor unless:

(1) The court of this state finds that the court of the state which issued the decree or order:

(A) Does not have continuing jurisdiction to modify the decree or order under jurisdictional prerequisites substantially in accordance with the uniform child custody jurisdiction act, or the uniform child custody jurisdiction and enforcement act, or has declined to assume jurisdiction to modify the decree or order, or

(B) does not have jurisdiction over a proceeding for adoption substantially in conformity with subsection (a)(1) through (4) or has declined to assume jurisdiction proceeding for adoption; and

(2) the court of this state has jurisdiction over the proceeding.

"(c) Before determining whether or not to exercise its jurisdiction the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by such court of another state and that a forum will be available to the parties.

"(d) If the court determines not to exercise its jurisdiction, it may dismiss the proceedings, or it may stay the proceedings upon condition that an adoption proceeding be promptly commenced in another named state or upon any other conditions which may be just and proper." K.S.A. 59-2127.

The Legislature elected not to structure that section to state affirmatively the conditions that give a Kansas court jurisdiction to hear an adoption case but instead chose to list the circumstances that may deprive our courts of jurisdiction. *In re Adoption of*

9

*H.C.H.*, 297 Kan. 819, 834, 304 P.3d 1271 (2013). Notably, J.D. does not argue that any of those potentially prohibitive circumstances apply to this case, and the record provides nothing that would have supported such an argument if it had been made.

*Venue*

J.D.'s statement of his first issue, "[w]hether the [s]tate of Kansas is the proper jurisdiction to hear the matter?" also may be construed to question the propriety of venue. That construction is supported by his arguments about the hardship and disadvantage to him that he claims accompanied having the case heard in Kansas. Any question of venue, however, is resolved by the venue section in KARA: "[i]n an independent adoption venue shall be in the county in which the petitioner resides or in the county in which the child to be adopted resides." K.S.A. 59-2126(a). J.D. does not challenge the facts showing the petitioners and child resided in Nemaha County.

*Summary*

J.D. does not contest the fact that placement of Baby Boy M. in Kansas was approved first by the state of Maine, then by Kansas, prior to taking the child from Maine. J.D. fails to support his bare allegation that either the omission of his name on the ICPC request, or the alleged falsehoods in N.M.'s affidavit, or both, acted to invalidate the child's transfer to Kansas and prohibited Kansas from exercising jurisdiction over the adoption. J.D. testified that he put his case to a court in Maine where he would have had the opportunity to offer all the arguments he presents here. Yet he reports that prior to the trial before the district court on the adoption, the court in Maine—which retained jurisdiction under the ICPC to act if it deemed it appropriate—denied his request that it assert authority over the case. We find no merit to the contentions that the district court lacked jurisdiction to enter its orders.

10

*Denial of request for paternity test*

For his second issue, J.D. contends that the district court "should have ordered"—or stated differently, abused its discretion when it failed to order—a paternity test. He argues the test was warranted to determine whether he should continue to pursue his parental rights. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

In Kansas, identification of a putative father is not required until the prospective adoptive parents file the petition for adoption and for the termination of parental rights of an unknown putative father. The statute requires that the names of both parents, "if known" be included, and—if any required information is not available—an affidavit explaining the circumstances regarding the unavailable information also becomes necessary. See K.S.A. 2016 Supp. 59-2130(a)(1), (2), and (c).

The record does not establish exactly when J.D. was identified as a putative father. It is clear, however, that after the petition for adoption and termination of parental rights was filed on November 23, 2016, J.D. was identified in the proceedings soon enough to receive notice of a December 30 hearing before the district magistrate, to which he responded by mid-December. From that point forward, J.D. repeatedly asserted his paternity and argued against termination of his parental rights.

J.D. not only pursued recognition and retention of his parental rights in Kansas, but also in the courts of Maine. Under those circumstances, the district court was neither legally nor factually in error by proceeding with the hearing on the petition to terminate the rights J.D. claimed to have and was not statutorily required to pursue a determination of parentage to assist J.D.'s decision-making about continuing his claims. See K.S.A.

11

2016 Supp. 59-2136(h)(1) ("When a father or alleged father appears and asserts parental rights, the court shall determine parentage, *if necessary* pursuant to the Kansas parentage act, K.S.A. 23-2201 et seq., and amendments thereto.") (Emphasis added.). We cannot say the district court acted at all unreasonably or abused its discretion in denying J.D.'s motion for paternity testing.

*Sufficiency of the evidence*

For his final issue, J.D. contends the adoptive parents failed to meet their burden to present clear and convincing evidence that his parental rights should be terminated. When a district court terminates parental rights based on factual findings made under K.S.A. 2016 Supp. 59-2136(h)(1), those findings are reviewed to determine whether, after considering all of the evidence in the light most favorable to the prevailing party, the truth of the findings was shown to be highly probable, i.e., supported by clear and convincing evidence. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re Adoption of B.B.W.*, No. 116,582, 2017 WL 2001668, at *2 (Kan. App. 2017) (unpublished opinion); K.S.A. 2016 Supp. 59-2136(h)(1) (findings must be based on "clear and convincing evidence"). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. at 244.

Adoption statutes are strictly interpreted in favor of maintaining the rights of the natural parents where the statute is being used to terminate the right of a natural parent without consent. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010). The party seeking to terminate a parent's rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 2016 Supp. 59-2136. 291 Kan. at 430.

After the May 2017 trial, the district court ruled that J.D.'s parental rights should be terminated. Pursuant to K.S.A. 2016 Supp. 59-2136(h)(1), a district court may terminate parental rights in an adoption proceeding if it finds, by clear and convincing evidence, any of the following:

"(A) The father abandoned or neglected the child after having knowledge of the child's birth;

"(B) the father is unfit as a parent or incapable of giving consent;

"(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

"(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

"(E) the father abandoned the mother after having knowledge of the pregnancy;

"(F) the birth of the child was the result of rape of the mother; or

"(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition." K.S.A. 2016 Supp. 59-2136(h)(1).

The district court found by clear and convincing evidence that J.D. was unfit as a parent (K.S.A. 2016 Supp. 59-2136[h][1][B]), and that after he had knowledge of the pregnancy, J.D. failed, without reasonable cause, to provide support for N.M. during the six months prior to the child's birth (K.S.A. 2016 Supp. 59-2136[h][1][D]). The district court found further that "the support [provided by J.D.], if any, was de minimus in nature and doesn't rise to the level of . . . support necessary." See K.S.A. 2016 Supp. 59-2136(h)(2)(B) (court may disregard incidental contacts, communications, or contributions).

*Unfitness*

The district court found J.D. to be unfit as a parent pursuant to K.S.A. 2016 Supp. 59-2136(h)(1)(B) because of his lifetime requirement to register as a sex offender as a result of his conviction for sexually abusing a two-year old girl, his homelessness, and his failure to provide adequate support. J.D. now contends his testimony demonstrated he only entered the plea to the unlawful sexual contact with a two-year old child because he was suicidal and had failed at four attempts to commit suicide. He claims his testimony at trial also established that the only remaining requirement relating to his sex offender status is that he continue to register and that his other child is in the custody of the state of Maine because he was homeless and unable to provide for her when she was taken from her mother.

J.D.'s reassertion of his trial testimony is more of an argument for this court to reweigh that evidence than a case for showing the district court's findings were not supported by clear and convincing evidence. We do not reweigh the evidence presented to the district court. See *In re Adoption of B.B.M.*, 290 Kan. at 244. The district judge stated he read the case file in its entirety prior to the trial on the petition. Both J.D.'s history of poor performance while under supervision following his release from prison for a sex crime involving a young child and the history of instability in his personal life were before the court, providing reasonable bases for that court's unfitness finding.

Since J.D. fails to provide argument or authority to demonstrate that the district court's findings of fact are not supported by clear and convincing evidence, and since the record has ample support upon which the district judge could rely, we find no error in the court's findings. As K.S.A. 2016 Supp. 59-2136(h)(1) states, a court may order termination of parental rights upon finding clear and convincing evidence of *any* of the seven grounds listed in subsections (h)(1)(A-G). Thus, the district court's termination in this case may be based on K.S.A 2016 Supp. 59-2136(h)(1)(B) alone.

14

*Failure to provide support to N.M.*

In addition, the district court found that after learning of the pregnancy, J.D. failed, without reasonable cause, to provide for N.M. in the six months leading up to the birth of the child. In its order, the district court based that finding on J.D.'s testimony "that he purchased clothing and other items for after the child was born and that he only provided minimal funds for maternity clothes for the biological mother prior to the birth of the child." The district court found "[a]ll of the support testified to is merely incidental" and may be disregarded. See K.S.A. 2016 Supp. 59-2136(h)(1)(D), (2)(B).

J.D. does not deny that his efforts at supporting N.M. during her pregnancy were minimal, but argues any shortcomings should be taken in the context of what was reasonable under his limited financial circumstances. He also contends his efforts at providing support to N.M. were rejected by her. Again, J.D. primarily relies on his own testimony.

J.D. testified that the support he provided to N.M. from May 1 to November 1, 2016, (the six months prior to delivery) amounted to his purchase of approximately $1,000 in clothing, food, diapers, wipes, formula, toys, blankets, and furniture. J.D. also testified that, prior to the trial, he got a tattoo on his arm of the child's name.

Under his circumstances, J.D. contends a reasonable person could not expect more of him than the $1,000 he spent on baby items leading up to the birth. However, K.S.A. 2016 Supp. 59-2136(h)(1)(D) requires support for the mother in the months leading up to birth. By his own testimony, while he was spending his resources on items that would be useful for the child after its birth, he only provided N.M. "at least a couple hundred of dollars" before the baby's birth. Further, the only evidence presented at trial that J.D.'s offers of support were refused by N.M. came from his own testimony.

15

The district judge found that "the explanations that are given by [J.D.] as to what support he provided and . . . why he didn't provide support are not believable." It is no more the role of this court to reassess J.D.'s credibility than it is to reweigh the evidence.

Upon review, the district judge's finding is supported by clear and convincing evidence that after learning of N.M.'s pregnancy J.D. failed, without reasonable cause, to provide support for N.M. in the six months leading up to the birth, and that the efforts he may have made toward her support during her pregnancy were incidental and could be disregarded. The termination of his parental rights should be affirmed under subsections (h)(1)(D) and (h)(2)(B). Again, under the terms of K.S.A. 2016 Supp. 59-2136(h)(1), that finding alone may provide the basis for the district court's termination of parental rights.

*Conclusion*

When viewed in the light most favorable to the adoptive parents, there was clear and convincing evidence to support the district judge's findings of fact in support of termination of J.D.'s parental rights based on unfitness and failure to provide support to N.M. We find no error in the district court's decision.

Affirmed.