NOT DESIGNATED FOR PUBLICATION

No. 120,634

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of M.W.


MEMORANDUM OPINION

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Opinion filed October 4, 2019. Affirmed.

*Zachary S. Peterson*, of Walter & Walter, LLC, of Norton, for appellant natural mother.

*J. Alex Herman*, of Herman Law Office, P.A., of Hays, for appellee stepmother.


Before BRUNS, P.J., LEBEN, J., and BURGESS, S.J.

PER CURIAM: H.W. (Mother) appeals the district court's granting of a stepparent petition for adoption of M.W., her biological child. Mother argues that the trial court lacked sufficient evidence to find that she failed to assume her parental duties for two years before the filing of the adoption petition allowing the termination of her parental rights and the adoption of M.W. without her consent. Mother also argues that the district court failed to consider the surrounding circumstances of Father's alleged abuse of Mother and hindrance of her ability to see her children in determining that she failed to assume her parental duties. Finally, Mother argues that the district court erred in granting the adoption of M.W. by her stepmother without Mother's consent. Finding no error in the district court's decision, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

M.W.'s biological parents were married in 1998. Mother and Father had two children during that marriage—M.W. and B.W. According to Mother, Father was physically, emotionally, and sexually abusive throughout their marriage. This abuse, according to Mother, is why she moved to Oklahoma City, Oklahoma, in 2009. Father maintains that Mother left to go to a concert and to be with her ex-boyfriend. Shortly after Mother's move to Oklahoma City, Father filed for divorce.

After their divorce, the parents initially agreed to share custody of the children. Under that agreement, the children lived with Father and only B.W. was transported to Oklahoma City for visitation with Mother. After only six months, however, B.W. was no longer transported because Mother was without money, a license, or a registered vehicle and, thus, could not assume any of the transporting responsibilities. Soon after, Mother moved back to Hays, Kansas.

Once she returned to Kansas, Mother lived with her then boyfriend for a couple of months and also occasionally stayed at Father's home when she had nowhere else to stay. According to Father, Mother would usually stay only one or two nights but once stayed at his house for an entire week during the children's spring break in 2010. According to Father, Mother was allowed to stay in his home as long as she assumed all of the cleaning duties. According to Mother, she was also required to perform sexual acts while staying with Father.

While still living in Father's house in 2010, Mother was questioned by police regarding checks she forged from Father's business account. At the time of the questioning, police looked inside of Father's home. Because B.W. appeared to be in soiled clothing and because the house was in such deplorable living conditions— including clutter and moldy dishes throughout the home, gun ammunition on the floor, a

dead but still feathered duck in the fridge, soiled clothing piles, and rancid deer remains in the garage—the State filed a child in need of care (CINC) petition for the children. After adjudication, Father successfully completed his parenting classes, cleaned up the home, and paid child support to the State. Mother, however, failed to participate in her reintegration plan in any meaningful manner. Mother's wages were eventually garnished to pay support to the State. The children were eventually returned to Father's home, and the CINC case was dismissed in January 2012.

In November 2012, Mother served 60 days in jail for failing to report to her probation officer for the theft case conviction stemming from the forged checks incident. After her release, Mother lived in a hotel in Hays. It was there that Mother had her last meaningful contact with M.W. on February 28, 2013, after Father dropped M.W. off for a three-hour visit. According to Mother, when Father picked M.W. up, he threatened Mother's life by stating that he was going to "take [M.W.] to his mother's house . . . and . . . come back to finish what he started and this time he might just end it." According to Mother, this made her fear for her life and forced her to move to Salina that same night. According to Father, Mother was still at her hotel on March 1, 2013, because that was the date Father explained to Mother he was planning on marrying his then girlfriend (Stepmother). According to Father, it was shortly after that date that Mother made the choice to move to Salina.

In August 2013, Father married Stepmother—the petitioner in this case. At that time, Stepmother and Father lived together with their children, including M.W. and B.W.

While in Salina, Mother lived in a women's shelter for approximately two weeks. After that, she moved to Kansas City, Missouri, and stayed in another women's shelter. According to Mother, that move was required because she believed that Father "found [her] location." While in Kansas City, Mother began using methamphetamine. Her drug use eventually led to another arrest in July 2016. After Mother was released on probation,

3

she violated that probation by failing to attend a scheduled group session, consuming alcohol, and for failing a urine analysis for the use of methamphetamine.

In September and December 2017, Mother attempted to get Father's permission to visit M.W. but Father refused. Mother also attempted to email Father on several occasions from 2013 to 2016. Father admittedly read and answered very few of those emails. Father also acknowledged that his lack of communication with Mother may have inhibited her ability to see her children. Still, Father maintained that Mother could have sought a modification of the divorce order and its visitation provisions. If the district court required visitation with Mother, Father maintained he would have obeyed those orders.

Eventually, Mother was allowed some contact with the children. In late 2016, Father agreed to bring B.W. to speak with Mother at a local fast food restaurant. The two spoke for around 30 minutes while Father waited in the vehicle outside. During that meeting, Mother used much of her time to speak negatively about Father. Then in 2017, Mother appeared at M.W.'s school concert but did not speak with M.W. before leaving the concert. Similarly, Mother attended a carnival that M.W. was also attending but Mother did not acknowledge M.W. despite passing by her several times. Other than these few incidental encounters, Mother has had no meaningful contact with B.W. or M.W. since 2013.

In April 2018—almost nine years after her divorce from Father and two years after her methamphetamine conviction—Mother filed a motion to review the custody of her children. Mother claimed that she waited to file that motion because at first she was too afraid of Father to initiate any proceedings, she could not find an attorney to represent her, and she had a heart attack as a result of not being able to see her children.

Finally, in May 2018, Stepmother filed a petition for a stepparent adoption of both children. Because B.W. was already of lawful age, he was able to consent to the adoption. Mother does not contest the district court's granting of the adoption of B.W. However, the district court also granted Stepmother's petition with regard to M.W. and found that Mother's consent to the adoption was unnecessary under K.S.A. 2017 Supp. 59-2136(h)(1)(G) because Mother failed to assume her parental duties for two years prior to the filing of the adoption petition. In making its final ruling, the district court also rejected Mother's accusations against Father regarding the abuse she alleged as inconsistent with other evidence presented at the adoption hearing.

Mother timely appeals.

*Legal Analysis*

Mother argues that there was insufficient evidence to support the district court's finding that she had not assumed parental duties for the two years prior to the filing of the adoption petition. As such, Mother asks our court to find that her consent was necessary and to reverse the district court's decision.

A district court's finding under K.S.A. 2017 Supp. 59-2136(h)(1)(G) that a parent has refused or failed to assume parental duties for two years prior to the filing of the petition for stepparent adoption is a finding of fact that will be reviewed on appeal to determine if it is supported by substantial competent evidence. *In re Adoption of J.M.D.*, 293 Kan. 153, 170-71, 260 P.3d 1196 (2011). In determining whether the parent's efforts amount to an assumption of parental duties, the court must examine all surrounding circumstances. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010).

Where an adoption statute is being used to terminate the right of a natural parent, it must be strictly interpreted in favor of maintaining the rights of the natural parent. 291

Kan. at 430; *In re A.S.*, 52 Kan. App. 2d 173, 177-78, 364 P.3d 1203 (2015). The party seeking to terminate a parent's rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 2017 Supp. 59-2136. *In re Adoption of Baby Girl P.*, 291 Kan. at 430. When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010).

Under K.S.A. 2017 Supp. 59-2136(h)(1)(G), Mother's consent was required unless it could be shown that she failed or refused to assume her parental duties for two consecutive years immediately before the filing of the petition for adoption. Mother acknowledges the lack of involvement with her children for the two years immediately before the filing of the petition but argues that the district court failed to consider facts preceding those two years. Specifically, Mother argues that the district court failed to consider Father's alleged physical, sexual, and mental abuse toward Mother. It was this alleged abusive treatment and the resulting post-traumatic stress disorder (PTSD) that Mother blames for her "running away, moving a lot, perceiving danger and fleeing, and isolation." Mother also argues that Father inhibited her ability to assume her parental duties by failing to address her requests to visit her children. In other words, Mother argues that her failure to maintain a parent-child relationship with M.W. was Father's fault. While it is true that our court may consider facts that occur outside of the two-year time period, and that a parent's ability to assume their duties as a parent can be impacted by issues outside of the parent's control, the evidence here still supports the district court's decision to grant Stepmother's petition for the adoption of M.W. See *In re Adoption of F.A.R.*, 242 Kan. 231, 236-37, 747 P.2d 145 (1987) (finding events occurring more than two years preceding adoption petition relevant in stepparent adoption analysis).

At the petition hearing, Mother was proved to be unavailable for her children physically, emotionally, and financially. Mother admits that she has had no meaningful

6

contact with M.W. since 2013 and that she has regularly maintained a fairly transient lifestyle by moving throughout the State of Kansas, Oklahoma City, Oklahoma, and also Kansas City, Missouri, for a short period of time. Mother even acknowledged that her choice to leave town was not in the best interests of her children. Additionally, Mother concedes that she has struggled with drug use and has even been arrested and criminally convicted in relation to her drug use. Once on probation for her drug conviction, Mother violated her probation on three separate occasions by failing to attend a group session, consuming alcohol, and for failing a urine analysis for the use of methamphetamine. Although Mother testified that she has been sober for the two-and-one-half years preceding the adoption petition hearing, her failed urine analyses for use of methamphetamine was confirmed just one year before the adoption petition was filed. Mother testified that she attempted to offer financial assistance for her children through emails but Father refused it. However, Mother failed to produce evidence of any such offering despite producing several emails showing her attempt to contact Father regarding visitation. While it is evident that Father often failed to facilitate Mother's attempts to visit her children, the record shows that Father did arrange some visits with the children and also shared Mother's messages requesting visits with the children to B.W. The record also shows that Mother failed to make use of other options and opportunities to fulfill her role as a parent.

When presented with the opportunity to speak and interact with M.W., Mother did not. Two of these opportunities were presented to Mother at M.W.'s winter concert and the carnival they both attended, but Mother did not take advantage of them. Mother apparently avoided contact with B.W. under a similar circumstance when B.W. saw her driving past his home without any attempt to waive or speak to him. Mother did occasionally contact B.W. through Facebook messages and, as stated, met him once in person to speak with him at a fast food restaurant. Mother also spoke very briefly to B.W. at his high school graduation. But B.W. felt that none of these contacts were meaningful. It was not until April 2018 that Mother sought to change the custody agreement. Almost

nine years elapsed since the order was first put in place before Mother sought to change the custody agreement and visitation rights. This lapse in time cannot be excused by Mother's unfortunate circumstances alone.

It is noteworthy that Mother has faced significant challenges in her life. Mother's therapist testified that Mother has been diagnosed with PTSD, adult attention deficit disorder, and generalized anxiety disorder which Mother relied on in trying to explain why she failed to assume her parental duties. That diagnosis was based on Mother's symptoms as well as the history she presented to her therapist regarding Father's alleged abuse. However, Father never conceded to that abuse and the district court found Mother's accusations against Father were unsupported. Mother testified that Father was always a good parent to the children and treated the children well. Mother also testified that she endured post-partum depression after M.W.'s birth, while she was also grieving the death of her own Mother in 2007. In 2008, Mother attempted suicide after Father allegedly found her in a hotel with another man. Even considering these experiences, Mother still failed to assume her parental duties in virtually every respect. Mother took no advantage of the parental rights that were legally available to her. Whatever steps Mother claims to have taken to fulfill her duties as a parent were inadequate and failed to meet the needs of her children.

*Conclusion*

Because the district court's decision was supported by substantial competent evidence, its decision to grant Stepmother's adoption petition without Mother's consent is affirmed.

Affirmed.