NOT DESIGNATED FOR PUBLICATION

Nos. 124,426
124,427

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of
S.A.P. and K.N.P.,
Minor Children.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; DAN K. WILEY, judge. Opinion filed May 13, 2022. Affirmed.

*Jeffrey A. Sutton*, of Sutton Law Office, L.L.C., of Basehor, for appellant.

*Jordan Pemble*, of Leavenworth, for appellee.

Before GARDNER, P.J., HILL and ISHERWOOD, JJ.

PER CURIAM: Stepmother petitioned to adopt her husband's two minor children, arguing that Mother's consent was unnecessary because Mother had failed to parent the children for the last two years. The district court found Stepmother failed to meet her burden of proof, so Mother's consent was required. Stepmother, who lacked Mother's consent to adopt, appeals the district court's dismissal of her petition. Finding no error, we affirm.

*Procedural Background*

S.M., natural mother, and J.H., natural father, are the parents of S.A.P. (born in 2008) and K.N.P. (born in 2011). The Leavenworth District Court granted Mother and

1

Father a divorce in November 2014. Father married C.H., Stepmother, in October 2015. Between 2011 and 2015, Mother and the children lived in California. Because the district court had only in rem jurisdiction at the time of the divorce, it did not issue child custody or support orders. According to Mother, after the divorce, Mother and Father agreed to abide by a "year-on/year-off" parenting plan for the children.

Stepmother petitioned to adopt S.A.P. and K.N.P. in October 2019. Because the district court required a separate petition for each child, Stepmother filed another petition in December 2019. The district court held a joint trial then ruled Stepmother had failed to prove by clear and convincing evidence that Mother "'failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition.'" As a result, Mother's consent to the adoption was required. Because Mother had not consented to the adoption, the district court dismissed Stepmother's petitions.

Stepmother timely appeals the district court's dismissal of both petitions. We consolidated the two cases on appeal.

*Did the District Court Err in Misinterpreting or Misapplying K.S.A. 2020 Supp. 59-2136?*

The United States Constitution's Due Process Clause provides substantive protection for parents when they have assumed parental duties. But when a parent has not accepted some measure of responsibility for his or her child's future, the Constitution will not protect the parent's mere biological relationship with the child. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1060, 190 P.3d 245 (2008).

The district court has jurisdiction to review a petition for adoption under the Kansas Adoption and Relinquishment Act. K.S.A. 59-2111 et seq. That Act permits a stepparent to petition for adoption although the stepparent has not obtained the natural

2

parent's relinquishment or consent to the adoption. K.S.A. 2020 Supp. 59-2136(a). When a stepparent petitions for adoption, the consent of the parents is generally required. K.S.A. 2020 Supp. 59-2129(c). But exceptions to that rule exist. K.S.A. 2020 Supp. 59-2136(h)(1)(A)-(G). One such exception allows adoption without the parent's consent if the parent has "failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition." K.S.A. 2020 Supp. 59-2136(h)(1)(G). See K.S.A. 2020 Supp. 59-2136(b) (providing that the portions of the statute applicable to the father shall also apply to the mother). Stepmother relies on that exception here.

We strictly interpret adoption statutes in favor of maintaining the rights of the natural parents when a petitioner tries to terminate a natural parent's right without their consent, as Stepmother does here. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010); *In re A.S.*, 52 Kan. App. 2d 173, 177-78, 364 P.3d 1203 (2015). The party seeking to terminate a parent's rights has the burden of proving by clear and convincing evidence that termination is appropriate under K.S.A. 2020 Supp. 59-2136(h)(1); *In re Adoption of Baby Girl P.*, 291 Kan. at 430. Stepmother bears that burden here.

In determining whether a natural mother has failed to assume the duties of a parent, the district court "[s]hall consider all of the relevant surrounding circumstances," and "may disregard incidental visitations, contacts, communications or contributions." K.S.A. 2020 Supp. 59-2136(h)(2)(A) and (B); *In re Adoption of G.L.V.*, 286 Kan. at 1053-54; *In re Adoption of J.M.D.*, 293 Kan. 153, 167, 260 P.3d 1196 (2011). As used here, "Incidental" means "'casual, of minor importance, insignificant, and of little consequence.'" *In re Adoption of C.R.D.*, 21 Kan. App. 2d 94, 98, 897 P.3d 181 (1995). The district court may also consider reasons behind a parent's inaction. See *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987). Similarly, the district court

may consider whether a custodial parent interfered with the noncustodial parent's right to maintain contact with his or her children. 242 Kan. at 237.

When a district court terminates a person's parental rights based on factual findings made under K.S.A. 2020 Supp. 59-2136, this court reviews those findings to determine whether, after reviewing all the evidence in the light most favorable to the prevailing party, the findings were highly probable or supported by clear and convincing evidence. K.S.A. 2020 Supp. 59-2136(h)(1) (findings must be based on "clear and convincing evidence"); *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). When determining whether factual findings are supported by clear and convincing evidence, an appellate court does not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. 290 Kan. at 244.

But here, our standard of review differs in part because the district court found Stepmother failed to meet her burden of proof. When a district court so finds, the district court has made a negative factual finding. *In re Adoption of D.D.H.*, 39 Kan. App. 2d 831, 836, 184 P.3d 967 (2008); see *In re B.L.M.*, No. 104,134, 2010 WL 5185826, at *7-8 (Kan. App. 2010) (unpublished opinion) (using negative factual finding review in adoption by termination of parental rights case). That standard, as applied here, means we must not reject the district court's decision unless Stepmother proves the district court arbitrarily disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. See *State v. Douglas*, 309 Kan. 1000, 1002-03, 441 P.3d 1050 (2019). We review the facts in light of that standard, focusing on Mother's acts from October 2017 to October 2019—the two years before Stepmother petitioned to adopt—and stating background facts for context.

Mother testified that because the Kansas district court did not have jurisdiction over the children when she and Father divorced, the parties did not have an official parenting plan. They agreed, however, to change physical custody of the children every

year. The children would live with Mother in California for a year, then go to her aunt's home in New York over the summer, then Father would pick the children up and take them home with him until the next summer. She let her children leave their California home only because of that agreement.

The children lived with Mother in California until 2015 when the children went to live with Father in Kentucky for his year-on. In the summer of 2016, Mother did not take the children back for her year-on because she had lost her job because the company had financial issues. Because Mother could not take care of the children, she asked Father if he would keep them until she found stable housing and another job. Mother was able to Skype with the children in 2016 to early 2017, although Stepmother said Mother often failed to follow through with scheduled communication with the children.

Mother became concerned in 2017 that she was unable to get ahold of her children on Skype while they were with Father. In April 2017, Mother emailed Stepmother and Father several times to say she planned to get the children in the summer of 2017 for her year-on because she was their mother, it was her year to have them, and they should live with her. Father then became evasive with the children and with his address. Father was discharged from the military and moved with Stepmother and the children to Kansas in 2017, but Mother did not know his address.

Mother sent other emails, but Father and Stepmother stopped communicating with her. Because Mother could not contact either Stepmother or Father for several days, she called the police to conduct a welfare check and said she planned to get her children at the school bus stop. Mother acknowledged Father and Stepmother had asked her for a judicially approved order for custody and parenting time before they would let the children return to California with her in 2017.

Stepmother and Father blocked Mother on social media and ignored her phone calls and emails. Father and Stepmother kept their new address secret from Mother because they feared that Mother would just take the children if she knew their address. Mother did not have the children's address in Kansas until she hired a private investigator.

Mother had hired Christopher Scott to represent her in the fall of 2017. Scott filed Mother's motion to establish parenting time in February 2018 then sent Father two notices of the hearing for that motion. When Scott could not find Father, he hired a private investigator to do so. The private investigator served Father with notice in August 2018. In apparent response, Father moved the district court in September 2018 to establish child support.

After Mother moved to establish parenting time, she had no electronic communication with the children The parties later agreed to a temporary parenting plan that allowed Mother to have supervised recurring parenting time with the children. Mother did not have physical contact with the children until January 2019, when she had a supervised visit through the Leavenworth Court Appointed Special Advocate (CASA) program. Mother drove from California for the visit and drove back home that same night. Mother did not directly contact her children after that visit because she was relying on her attorney for direction. Mother moved to Kansas in October 2019, as soon as her husband was discharged from the Navy, and she next saw her children in January or February 2020.

Briana Burgess, a program coordinator for the First Judicial District CASA Association visitation and exchange center, testified to her involvement in the visitation arrangement between Mother and Father. Mother had her first supervised visitation in January 2019, and Burgess did not hear back from the parties the rest of that year. When the COVID-19 global pandemic hit, Burgess did not have Father's current phone number

at her home office, and so she could not get ahold of him. Once she got his number in June 2020 and contacted Father, he timely cooperated. In the meantime, Mother had reached out in March 2020 to schedule a visitation, and Burgess contacted Mother to schedule another visitation. She had told Mother at the beginning of the process in January 2019 that, for CASA to send a court report, CASA must have notice of a hearing with the district court. But she knew of no reason why Mother would be waiting on her to prepare a report before scheduling more parenting time.

Burgess clarified on cross-examination that she had told Mother in March 2020 that she had not yet received a court order or contact from Father to restart service and she would need to complete an intake with both parties to move forward because CASA typically closes a case file after six months of inactivity. She clarified that from March to roughly June or July 2020, Mother did not have visitation with the children because Burgess could not get in contact with Father. She agreed that the parties could contact CASA to set up visitations without a court order.

Stepmother testified that she and Father had taken full custody of the children in August 2015, that she had given Mother their new Kansas address in 2017, and that law enforcement had conducted welfare checks on the children at least twice at Mother's request. Communication, such as Skype, stopped between the children and Mother because Stepmother and Father were concerned by Mother's statement to law enforcement that she would pick up the kids from their bus stop.

Stepmother stated Mother refused to get legal representation to establish a custody agreement. Stepmother and Father took the kids on a trip to New York in July 2016 to visit Mother and Mother's aunt. Mother had promised to visit the children in Kentucky but would never show. Mother never offered to pay child support and said she should not have to pay since they were her children. When Stepmother and Father picked K.N.P. up in California, Mother did not provide shoes or a car seat and K.N.P. had lice. When

Stepmother and Father picked up S.A.P. from the airport, Mother's family members had provided his clothing because Mother had sent him to New York with only the clothes on his back.

Stepmother testified that she and Father did not deny communication between Mother and the children—they returned her calls until April 2017. They did not block Mother's phone calls or emails but did block her on social media because they were concerned about her comments to law enforcement that she may grab the kids from the bus stop. Stepmother also stated that in the two years before she filed for adoption, Mother did ask for the children to move back to California and live with her. Stepmother and Father refused that request in April 2017 because they wanted to have an established agreement before they allowed Mother to leave the state with the children.

Jodi Rivera, a family friend whom Mother treats as an aunt, testified that she had regular contact with the children since they were born and that the children had stayed with her in New York for several summers for four or five weeks at a time. Father and Stepmother cut off contact with Rivera after they visited her in New York in July 2016. She traveled to Kansas and saw Father, Stepmother, and the children at their home around the time Mother's private investigator found Father—in August 2018.

K.P., the children's maternal grandmother, testified to her previous schedule of calling the children on Saturdays. But after a while, Stepmother would not answer the calls, even though Grandmother had been told to call Stepmother and not Father.

Scott testified to his representation of Mother in her attempt to establish parenting time. Scott sent two notices of Mother's motion to Father—one to his last known address and the other to his place of employment—both came back as "return to sender." After confirming Father's place of employment, Scott hired a private investigator to serve

Father. After the first supervised visit with CASA in January 2019, Scott thought he and Mother were waiting for CASA to file a report.

Scott and Mother discussed that it would likely be in her best interest to move to Kansas so she could have a better relationship with her children and establish parenting time. Shortly after that discussion, Stepmother petitioned to terminate Mother's parental rights and adopt the children. Scott advised Mother to be cautious about reaching out to Father about the children after the first CASA visitation because of the adversarial nature of their previous contact. Although he knew of no restrictions precluding Mother from having more parenting time, Scott believed Mother relied on his advice not to get into a conflict with Father so she could continue to see the children.

The district court's written order correctly set out the governing law, noting:

- Stepmother had the burden to prove by clear and convincing evidence that Mother's consent was unnecessary due to her failure or refusal to assume the duties of a parent for two straight years immediately preceding the filing of the petition;
- The court may disregard incidental visitations, contacts, communications or contributions;
- The court must consider the surrounding circumstances; and
- The court had a duty to strictly construe the adoption and relinquishment statute in favor of maintaining the natural parent's rights.

The district court applied the law to the factual findings of the preceding two-year-period, and found:

- Mother provided no child support, despite later having the ability to do so.
- Father did not request child support until September 2018.

- Mother had a common-law duty to provide support.
- Mother had only one in-person visit with the children, in January 2019.
- Mother had no other contact with the children.
- Mother began the judicial process by hiring a lawyer in the fall of 2017 and moving to establish parenting time in early 2018.
- The process stalled when Mother could not find Father to serve with notice.
- After the supervised January 2019 visit, Mother did not reach out to CASA or Father to schedule another visit.
- Mother's attorney believed they were waiting for a court report from CASA before moving forward.
- Mother did not try to contact the children by phone or email.
- Mother's attorney believed his actions caused Mother not to contact the children so as to avoid adversarial interactions with Father and Stepmother.
- Mother's attorney advised her to move to Kansas from California if she wanted a substantial relationship with her children.
- Mother moved to Kansas in October 2019.

Based on these facts, the district court found Stepmother failed to meet her burden of proving Mother failed or refused to assume parental duties for the relevant two-year-period, and denied Stepmother's petition to adopt S.A.P. and K.N.P.

The district court's decision is not based on an arbitrary disregard of undisputed evidence. See *In re Adoption of D.D.H.*, 39 Kan. App. 2d at 836-38. In making its finding, the district court considered each piece of evidence and weighed it against other evidence and the testimony. The district court addressed the evidence disfavoring Mother, noting that it was "inexplicable" that she had failed to reach out to the children through either phone or email after the initial supervised visitation. The district court also found that Mother had failed to pay child support, even though she had a common-law

duty to do so. So the district court considered unfavorable and undisputed evidence in making its decision.

The record is devoid of any evidence that the district court based its decision on extrinsic considerations such as bias, passion, or prejudice to reach its decision. See *In re Adoption of D.D.H.*, 39 Kan. App. 2d at 836-38. To the contrary, the district court considered both sides as its comments at the close of the trial reflect: "What in this particular case—and this is a much more difficult case, I think, than what any of the parties recognize. If you think this is a slam dunk on either side, I think you're wrong." The district court echoed that same sentiment again after giving both parties a chance to respond to an additional question.

Although Stepmother argues that the district court erred in misapplying and misinterpreting the adoption and relinquishment statute, her brief focuses on Mother's failure to pay child support or to comply with the district court's order about a related discovery request. Those facts are important to Father's motion for child support but are not controlling in deciding Stepmother's petition for adoption. The rest of Stepmother's brief argues that the district court erred because "clear, convincing, and unrebutted evidence" shows that Mother failed to act as a parent or assume parental duties. But this court does not reweigh evidence or pass on credibility. See *In re Adoption of B.B.M.*, 290 Kan. at 244.

The district court neither arbitrarily disregarded undisputed evidence, nor based its decision on extrinsic considerations like bias, passion, or prejudice to reach its decision. See *In re Adoption of D.D.H.*, 39 Kan. App. 2d at 836-38. As a result, the district court did not err in finding Stepmother failed to meet her burden that Mother's consent was unnecessary.

Affirmed.