NOT DESIGNATED FOR PUBLICATION

Nos. 125,210
125,211

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of J.A.E. and J.M.E.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Submitted without oral argument. Opinion filed February 2, 2024. Affirmed.

*Dennis J. Stanchik*, of Shawnee Mission, for appellant.

*Robert G. Harken*, of Overland Park, for appellee natural father.

Before ATCHESON, P.J., MALONE and BRUNS, JJ.

PER CURIAM: J.G. (Stepfather) appeals the district court's denial of his petitions for the stepparent adoption of J.A.E. and J.M.E. without the consent of their biological father, J.E. (Father). The district court found that Stepfather did not meet his burden of showing that Father failed or refused to assume his parental duties for the two years before the petitions were filed. Stepfather contends on appeal that the district court made several factual and legal errors when it denied his petitions. Although we may disagree with some of the district court's legal analysis, we find there was no reversible error. We find that the district court's factual findings were supported by substantial competent evidence and were sufficient to support the district court's legal conclusion to deny Stepfather's petitions. Thus, we affirm the district court's judgment.

1

J.E. and M.G. (Mother) are the biological parents of two minor children, J.A.E. (born in 2006) and J.M.E. (born in 2011). After a paternity action in 2012, the parties entered into an agreement in which Mother received sole custody and Father received a few hours of visitation each week. The agreement also established a child support plan.

From 2012 to 2018, Father exercised some of his visitation rights, although the parties disputed how often Father visited his children. The evidence showed that Father failed to pay a substantial portion of his child support during this time. The paternal grandparents were also active in the children's lives and provided a lot of financial assistance for the children. Although the record is unclear, it appears that at one point the grandparents had to litigate to obtain a visitation order for the children.

In August 2018, Father was incarcerated. The record is unclear why, but it may have been for theft. Mother later served him with a protection from abuse (PFA) order that prevented him from contacting the children. Mother explained she filed the PFA order because Father sent "threatening text messages to me and my children." One text message read: "Next time those stinky ass rats come to your job you should say I love my children, and that's just a word to the wise." Father did not physically harm Mother or the children, but Mother claimed she feared Father after he was incarcerated.

At trial, Father testified he did not know why the PFA was in place, did not have the opportunity to represent himself against the petitions, and did not know he could represent himself while he was incarcerated. Father also testified he followed the court order because he wanted to avoid trouble and did not have the resources to fight the order. Father denied threatening Mother's life, denied calling her a "rat," and denied sending other text messages from a phone number he did not recognize.

The paternal grandparents often saw the children while Father was incarcerated. They babysat the children, helped Mother run errands, attended birthdays and holidays with the children, and attended the children's sporting events. The grandparents later testified that along with providing substantial financial support to Mother, they bought new clothes, school supplies, and sports equipment for the children. The grandparents also helped Father connect with the children while he was incarcerated, including sending gifts and cards. Father testified he did not send the gifts to Mother because he feared the children would not receive them.

Father remained incarcerated when the PFA order was lifted in September 2020, and he reached out to the children immediately. Father sent Mother a letter indicating he wanted to reconnect with the children, and he tried to call J.A.E.'s cellphone several times. Father believed Mother was blocking his calls and preventing the children from speaking with him. Father testified he was only able to communicate with the children when they visited their paternal grandparents once a week for two or three hours.

On November 10, 2020, Stepfather petitioned for stepparent adoption of the children. Father did not consent to the adoption. In his petitions, Stepfather alleged Father's consent to the adoption was not required because Father failed or refused to assume the duties of a parent for the two consecutive years preceding the petitions. At the initial status conference, the district court announced that a guardian ad litem (GAL) had been appointed to represent the children with the cost to be split by the parties.

In April 2021, Father arrived at the Wichita Work Release, where he resided through the time of trial on December 14, 2021. Mother, Father, Stepfather, the paternal grandparents, and other witnesses testified at the trial, and the parties introduced many exhibits, none of which are included in the record on appeal.

Father testified at the hearing to his child support obligations. Father had to pay $622 per month from 2012 until 2015. After July 2015, Father's obligation was reduced to $538 per month. Father confirmed during his testimony that he had paid only a small portion of his $41,878 total obligation. But he later explained his payments were limited by either his incarceration or his inability to afford the payments. Father testified that while at the Winfield Correctional Facility, he had $10.50 deducted from his monthly income of $30.00 for payment of child support. Also while incarcerated, Father requested that his COVID stimulus payment of $1,800 be paid either to Mother or to the child support payment center. Father testified that out of the $2,600 he earned during his incarceration, $2,000 was paid to Mother for child support.

Father also testified how the PFA order prevented him from contacting the children, and why he did not try to modify its terms. He testified about his belief that Mother prevented the children from receiving gifts he sent or returning his calls and messages. Father spoke about a few messages he sent J.A.E. after the PFA order was lifted, but the messages were not included in the record.

Mother testified on behalf of Stepfather. Mother testified she was awarded sole custody of the children, with Father being awarded supervised two-hour visits on Wednesdays and Sundays. Mother discussed Father's lack of child support payments over the years. A comprehensive record of Father's child support payments was admitted as an exhibit at the hearing, but the exhibit is not included in the record on appeal. Mother also testified about threatening text messages she allegedly received from Father in 2018, which prompted her to file for the PFA order that included the children. Mother confirmed that Father never physically struck her or the children.

Stepfather testified about his relationship with Mother and the children, and he spoke to his conversations with the children about the adoption. Stepfather testified he "definitely wanted to make sure [the children] were 100 percent understanding, you

4

know, of what all of this [the stepparent adoption] meant and what it included." Later, Stepfather claimed Mother could not have blocked Father's number from J.A.E.'s cellphone because only he could have blocked the number as the account holder.

Father then presented the testimony of his mother and father, the paternal grandparents. The paternal grandmother testified to Father's loving relationship with the children before his incarceration and the grandparents' continued relationship with the children once Father was incarcerated. She also contradicted portions of Mother's testimony about the amount of time Father spent with the children before his incarceration. Similarly, the paternal grandmother supported Father's testimony that he tried to call and text the children many times, but the calls would often go straight to voicemail as if Mother had blocked the calls. She clarified that Father has no connection with the children except for when they are with the grandparents and Father "either calls or we call him so he can speak to them. That is the only time."

The grandparents testified about the financial support they provided to Mother and the children. The paternal grandmother testified to buying groceries and sporting equipment. The paternal grandfather testified to paying the closing costs on Mother's home, paying for new appliances, carpet, and $20,000 for a home remodel. Mother and Stepfather disputed the amount of financial support provided by the grandparents.

At the end of the testimony, the GAL indicated that she wanted to speak to the children again before filing a report with the district court. The GAL noted that during her investigation she had concerns about "manipulation and undue influence" on J.A.E. The district court ordered the GAL to prepare a written report to be submitted for the parties to review. The district court judge also told the GAL to inform the children that he would meet with them in person for interviews if they were willing.

The district court issued its ruling from the bench in a Zoom hearing on March 22, 2022. The district court began by noting that it had met with the minor children and the GAL had filed a report. The GAL report is not included in the record and the district court did not refer to the content of the report in making its ruling. At the start of its ruling, the district court opined that Stepfather's petition for adoption was "in effect also a petition to terminate the [paternal] grandparent rights . . . because if the Court grants this petition for stepparent adoption, those grandparents' rights are extinguished as well."

The district court then turned to the applicable statute, K.S.A. 2022 Supp. 59-2136, and ultimately found that Stepfather failed to prove by clear and convincing evidence that Father failed or refused to assume his parental duties in the two years before the petitions were filed. One issue was whether Father paid a substantial portion of his child support because Stepfather argued that Father's failure to do so created a rebuttable presumption that Father failed or refused to assume his parental duties. On this issue, the district court considered the fact that Father was incarcerated during the two-year period before the petitions were filed, and the district court found that Father paid as much support as he could during that time considering his incarceration. The district court also found that the paternal grandparents' testimony was "the most credible of all the people that testified in this case" and that the grandparents provided probably more than $30,000 in support to Mother and the children. The district court found that the financial support provided by the grandparents "can and should be attributed to [Father] because [Father] at the time was incarcerated and could not provide that support."

The district court also found that the PFA order contributed to the lack of contact between Father and the children in the two years before the petitions were filed. Based on these findings, the district court denied Stepfather's petitions for adoption. The district court filed a journal entry denying the petitions and incorporating the findings made on the record. Stepfather timely appealed, and the cases have been consolidated on appeal.

6

## DID THE DISTRICT COURT ERR IN DENYING THE PETITIONS FOR STEPPARENT ADOPTION?

Stepfather raises several issues on appeal contending the district court erred when it denied his petitions for stepparent adoption. First, he argues that the district court erred when it refused to terminate Father's parental rights because the district court's factual findings ignored evidence and were unsupported by substantial competent evidence. To support his argument, Stepfather applies the "two-sided ledger approach"—financial support as one side of the ledger and "'love and affection'" as the other—to argue that Father failed to perform his parental duties during the two years before the stepparent adoption petitions were filed. Second, he argues that the district court misinterpreted this case as an action to terminate grandparent visitation rather than termination of parental rights. Third, he argues the district court abused its discretion by giving Father a "'credit'" for any support provided to Mother and the children by the paternal grandparents.

Father argues that the district court did not err in denying Stepfather's petitions for adoption because Stepfather did not present clear and convincing evidence that Father failed or refused to assume his parental duties for the two years before the petitions were filed. Father contends that the district court's factual findings were supported by substantial competent evidence and Stepfather's argument to the contrary improperly reweighs the evidence and reassesses witness credibility. Father argues that he "pursued every reasonable opportunity to support his minor children even though he was incarcerated for two years" before the petitions were filed. Father also argues that the district court did not misinterpret the case as a termination of the grandparents' visitation rights. Finally, Father argues that the district court did not abuse its discretion in attributing to him the financial support given by the paternal grandparents because Kansas law requires courts to consider all relevant circumstances in an adoption action.

The only statutory ground under which Stepfather sought to terminate Father's parental rights so that the stepparent adoption petition could be granted without Father's

consent was that Father allegedly failed or refused to assume his parental duties for the two years before the adoption petitions were filed. Whether a biological parent has failed or refused to assume their parental duties for two years before the filing of a stepparent adoption petition is a question of fact reviewed on appeal to determine whether the district court's decision was supported by substantial competent evidence. *In re Adoption of J.M.D.*, 293 Kan. 153, 170-71, 260 P.3d 1196 (2011). In assessing the sufficiency of the evidence, an appellate court should not reweigh the evidence or pass on the credibility of witnesses. Rather, the appellate court should review the facts of the case in the light most favorable to the prevailing party below to determine whether the district court's decision is properly supported by substantial competent evidence. 293 Kan. at 171. To the extent that the district court's ruling involved statutory interpretation, our review is unlimited. *In re N.E.*, 316 Kan. 391, 402, 516 P.3d 586 (2022).

Before turning to the statutory grounds for termination, we recognize that Father has a constitutionally recognized liberty interest in parenting his children—a right deemed to be fundamental. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, judicial termination of the right requires proof by clear and convincing evidence. K.S.A. 2022 Supp. 59-2136(h)(1); *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010). Courts strictly construe adoption statutes in favor of maintaining the rights of biological parents where it is claimed that, by reason of a parent's failure to fulfill parental obligations as prescribed by statute, consent to adoption is not required. 291 Kan. at 430.

Stepfather filed his petitions for stepparent adoption and sought to terminate Father's parental rights under K.S.A. 2022 Supp. 59-2136, which states in part:

> "(h)(1)  When a father or alleged father appears and claims parental rights, the court shall determine parentage, if necessary pursuant to the Kansas parentage act, K.S.A.

8

2022 Supp. 23-2201 et seq., and amendments thereto. If a father desires but is financially unable to employ an attorney, the court shall appoint an attorney for the father. Thereafter, the court may order that parental rights be terminated and find the consent or relinquishment unnecessary, upon a finding by clear and convincing evidence, of any of the following:

. . . .

(G) the father has failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition.

(2) In making a finding whether parental rights shall be terminated under this subsection, the court:

(A) Shall consider all of the relevant surrounding circumstances; and

(B) may disregard incidental visitations, contacts, communications or contributions.

(3) In determining whether the father has failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition for adoption, there shall be a rebuttable presumption that if the father, after having knowledge of the child's birth, has knowingly failed to provide a substantial portion of the child support as required by judicial decree, when financially able to do so, for a period of two years immediately preceding the filing of the petition for adoption, then such father has failed or refused to assume the duties of a parent."

K.S.A. 2022 Supp. 59-2136(h)(1)(G) allows termination of a father's parental rights when the father has failed or refused to assume the duties of a parent for two consecutive years immediately preceding the filing of the petition. Stepfather filed his stepparent adoption petitions on November 10, 2020, so the two-year window specified in the statute extended from November 2018 to November 2020, and Father was incarcerated during that entire relevant period. Much of Stepfather's evidence at trial focused on Father's poor record of paying child support from 2012 to 2018. Courts may consider evidence outside the two-year period if the evidence is relevant to explain the parent's conduct during the two-year period. *In re Adoption of F.A.R.*, 242 Kan. 231, 238, 747 P.2d 145 (1987) (finding the trial court did not err in considering actions of a parent before the two-year period). But although the district court can hear evidence about a

9

parent's conduct outside the two-year window, Stepfather needed to present clear and convincing evidence that Father failed or refused to assume his parental duties for the two-year period immediately before the petitions were filed to terminate Father's parental rights under K.S.A. 2022 Supp. 59-2136(h)(1)(G).

In asserting that Father failed or refused to assume his parental duties for the two-year period before the petitions were filed, Stepfather argues on appeal that the district court failed to properly apply the "two-sided ledger approach" by weighing financial support as one side of the ledger and "'love and affection'" as the other, citing *In re Adoption of G.L.V.*, 286 Kan. 1034, 1038, 190 P.3d 245 (2008), as support. Stepfather fails to recognize this approach was overturned in 2011 after the Kansas Legislature amended the statute governing stepparent adoptions. See *In re Adoption of J.M.D.*, 293 Kan. at 159-68. In that case, after reviewing the statutory amendments and applicable caselaw in stepparent adoptions, our Supreme Court held: "[W]e put to rest the artificial constraints of the two-sided ledger approach and return to the historical approach of considering 'all surrounding circumstances.'" 293 Kan. at 167. Thus, Kansas courts should not employ the two-sided ledger approach to consider whether a parent has failed to perform their parental duties for the relevant two-year period. Rather, courts should review whether a parent has failed to perform their parental duties by considering "'all surrounding circumstances'" as stated in *In re Adoption of J.M.D.*, 293 Kan. at 167, or "all of the relevant surrounding circumstances" as stated in K.S.A. 2022 Supp. 59-2136(h)(2)(A).

One issue in this case was whether Father paid a substantial portion of his court-ordered child support because Stepfather argued that Father's failure to do so created a rebuttable presumption under K.S.A. 2022 Supp. 59-2136(h)(3) that Father failed or refused to assume his parental duties. On this issue, the district court considered the fact that Father was incarcerated during the entire two-year period before the petitions were filed. Our Supreme Court has recognized the difficulty incarcerated individuals have in

fulfilling their parental duties from a prison cell. See *In re Adoption of S.E.B.*, 257 Kan. 266, 273, 891 P.2d 440 (1995) (holding that when a nonconsenting parent in a stepparent adoption is incarcerated and unable to fulfill the customary parental duties required of an unrestrained parent, the court must determine whether such parent has pursued the opportunities and options which may be available to carry out such duties to the best of his or her ability); *In re Adoption of F.A.R.*, 242 Kan. at 236 (same).

The district court found that Father paid as much child support as he could during the two years immediately before the stepparent adoption petitions were filed considering his incarceration. This finding was supported by substantial competent evidence. Father testified that while at the Winfield Correctional Facility, he had $10.50 deducted from his monthly income of $30.00 for payment of child support. Also while incarcerated, Father requested that his COVID stimulus payment of $1,800 be paid to Mother or to the child support payment center. Father testified that out of the $2,600 he earned during his incarceration, $2,000 was paid to Mother for child support. Father was delinquent in his overall child support obligation from 2012 to 2020. But to terminate Father's parental rights under K.S.A. 2022 Supp. 59-2136(h)(1)(G), the relevant period under consideration was from November 2018 to November 2020. Father's testimony alone about his child support contributions while he was incarcerated, which the district court apparently found credible, was sufficient for the district court to decide that the rebuttable presumption under K.S.A. 2022 Supp. 59-2136(h)(3) did not apply.

The district court also found that the PFA order contributed to the lack of contact between Father and the children in the two years before the petitions were filed. This finding was supported by the testimony of Father and the paternal grandparents. The evidence also showed that Father immediately tried to contact the children once the PFA order was lifted. The district court properly considered this evidence as part of "all of the relevant surrounding circumstances" in deciding whether Father's parental rights should be terminated. K.S.A. 2022 Supp. 59-2136(h)(2)(A). Put another way, the district court

11

concluded Father's efforts while incarcerated were sufficient to show he made a reasonable attempt to support and contact the children.

This case is like *In re Adoption of K.R.D.*, No. 114,251, 2016 WL 758759 (Kan. App. 2016) (unpublished opinion), where this court reversed the district court's finding that a father did not assume his parental duties to allow a stepparent adoption without the father's consent. In that case, this court found the father made reasonable attempts to financially support his child with his meager prison earnings. 2016 WL 758759, at *4. This court also found that the father's attempts to communicate with the child were thwarted by the mother and his parents, which prevented him from fulfilling his parental duties. 2016 WL 758759, at *5. And notably, this court was unpersuaded by the fact that the father did not try to modify the terms of his divorce and child support obligation while imprisoned, given the limited funds available for the father to hire an attorney. 2016 WL 758759, at *5. As a result, this court determined that the stepparent adoption could not proceed because the father "'made reasonable attempts, under all the circumstances, to maintain a close relationship'" with his child. 2016 WL 758759, at *6.

Stepfather argues on appeal that the district court abused its discretion by giving Father a "'credit'" for any financial support provided to Mother and the children by the paternal grandparents. This finding was relevant to whether Father's failure to pay a substantial portion of his child support created a rebuttable presumption that he failed or refused to assume his parental duties. The district court found that the paternal grandparents' testimony was "the most credible of all the people that testified in this case" and that the grandparents provided probably more than $30,000 in support to Mother and the children. Mother and Stepfather provided conflicting testimony on this factual issue, but this court does not reweigh the evidence or reassess witness credibility on appeal.

The district court also found as a matter of law that the financial support provided by the paternal grandparents "can and should be attributed to [Father] because [Father] at

12

the time was incarcerated and could not provide that support." We need not decide whether this legal conclusion was erroneous because it was not determinative in the district court's ruling. As we have already discussed, Father's testimony alone about his child support contributions while he was incarcerated was sufficient for the district court to decide that the rebuttable presumption under K.S.A. 2022 Supp. 59-2136(h)(3) did not apply. Thus, any legal error committed by the district court in imputing the grandparents' financial contributions to Father did not affect the parties' substantial rights and is at most harmless error. See K.S.A. 2022 Supp. 60-261. We need not address this issue further.

Stepfather also argues that the district court misinterpreted this case as an action to terminate grandparent visitation rather than termination of parental rights. The district court prefaced its ruling from the bench by expressing its belief that Stepfather's petition for adoption was in effect a petition to terminate the paternal grandparents' visitation rights. We agree with Stepfather that this statement amounted to an erroneous comment by the district court. We have found no Kansas case that squarely addresses this issue. In *Sowers v. Tsamolias*, 262 Kan. 717, 941 P.2d 949 (1997), maternal grandparents petitioned the court for visitation with a child after the biological mother's parental rights had been terminated and after the child had been adopted by the foster parents. Our Supreme Court held that the grandparents *lacked standing* to petition for visitation under K.S.A. 38-129 (Furse 1993) because the adoption created a new legal status of parent and child upon the adoptive parents and the adopted child, and the child no longer remained the child of its natural parents. 262 Kan. at 718. Under these circumstances, the child had new parents and new grandparents as well. 262 Kan. at 718.

*Sowers* is distinguishable from our facts because the paternal grandparents here already have court-ordered visitation rights with J.A.E. and J.M.E., and they are not petitioning the court for grandparent visitation rights after the children were adopted by new parents. We find no language in K.S.A. 2022 Supp. 23-3301, the current statute on grandparent visitation rights, and K.S.A. 2022 Supp. 59-2136, the current statute on

13

adoption and proceedings to terminate parental rights, that would extinguish existing grandparent visitation rights to a child after the child has been adopted by a stepparent. Thus, we find the district court erred by believing that the stepparent adoption petition was in effect a petition to terminate the grandparents' visitation rights.

But we find the district court's error was harmless. In the balance of its lengthy ruling from the bench, the district court engaged in the proper statutory analysis under K.S.A. 2022 Supp. 59-2136(h). The district court fairly reviewed the evidence and found that Stepfather had not shown by clear and convincing evidence that Father had failed to assume the duties of a parent for the two years before the petitions were filed given the limitations imposed by his imprisonment and the PFA order. This determination is legally sufficient to deny the petitions, so the district court's consideration of the grandparents' visitation rights was superfluous to an otherwise proper conclusion. Stepfather asserts that the district court "appeared to be more concerned with the rights of the paternal grandparents as opposed to the rights of the natural father." But he does not explain how the district court's statement—or apparent assumption—impacted the result of this case.

As a final matter, Stepfather argues that the district court erred by refusing to allow J.A.E. to testify at the trial. Stepfather asserts that he should have been allowed to call J.A.E. as a witness because he is over 14 years old and his consent to the adoption was required under K.S.A. 2022 Supp. 59-2129(a)(6). But as Father points out, J.A.E. was represented by a GAL who told the district court that she did not want J.A.E. to testify because she was concerned that his thoughts about the case had been influenced by Mother and Stepfather. The GAL filed a written report with the district court, and nothing in the record suggests the report to be at odds with the court's findings and conclusions. And the district court clarified that it had met with the children before the court issued its ruling. We find no error in the district court's decision that J.A.E. should not testify at the trial. But even if the district court erroneously excluded this testimony, we have no basis

14

to reverse the district court's judgment for this reason without a proffer from Stepfather indicating the substance of J.A.E.'s expected testimony. See K.S.A. 60-405.

In sum, whether a biological parent has failed or refused to assume their parental duties for two years before the filing of a stepparent adoption petition is a question of fact reviewed on appeal to determine whether the district court's decision is supported by substantial competent evidence. The district court heard conflicting evidence and made factual findings that we will not reweigh on appeal. The district court ultimately found that Stepfather did not prove by clear and convincing evidence that Father failed or refused to assume his parental duties in the two years immediately before the petitions were filed given the limitation imposed by his imprisonment and the PFA order. This determination is legally sufficient to deny the stepparent adoption petitions. Although we may disagree with some of the district court's legal analysis, we find it was not determinative in the district court's ruling and was not reversible error.

The district court observed it is a positive thing that J.A.E. and J.M.E. have a father, mother, stepfather, and paternal grandparents who are all concerned for the children's care and well-being. We agree. And it is commendable that Stepfather is willing to assume the responsibilities and be recognized as the children's legal father. Stepfather can continue to exercise his positive influence over the children. But for the reasons stated in this opinion, we find no basis to overturn the district court's judgment to deny Stepfather's petitions for adoption without Father's consent.

Affirmed.